**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JAMES T. CURTIS,**

      **Plaintiff,**

**vs.**                                                  **Case No. 5:04cv387-RH/WCS**

**AL SOLOMON, DR. CHERRY,
DR. PANDIT, and ANN WELCH,**

      **Defendants.**

_____ /

## SECOND REPORT AND RECOMMENDATION[1]

A special report was filed on behalf of Defendants Solomon, Cherry, and Welch. Doc. 60.  The report was construed as a summary judgment motion and Plaintiff, a *pro se* inmate, has filed his opposition, docs. 64-65.

Defendant Pandit also filed a special report on March 6, 2006, doc. 74, and a supplemental affidavit, doc. 75.  That report was construed as a summary judgment motion and Plaintiff was just recently given until May 30, 2006, to submit opposition to this motion.  Doc. 83.  The first order giving Plaintiff additional time to respond to the

_____

[1] The first report and recommendation entered in this case, doc. 19, concerned Plaintiff's motion for a preliminary injunction or temporary restraining order.  The motion, doc. 11, was denied.  Docs. 19, 23.

second special report (motion for summary judgment) indicated that a ruling would be entered concerning the first summary judgment motion, doc. 60, "in due course."  Doc. 76.  Thus, it is not necessary to delay ruling on the first summary judgment motion, which has been pending since January 13, 2006.  *See* doc. 61.  Additionally, Plaintiff initiated this action on October 29, 2004, docs. 1-2, and service was returned executed as early as May 26, 2005.  Doc. 31.  It is time to move this case forward.

**Allegations of the second amended complaint, doc. 25**

Plaintiff has field suit against four Defendants: (1) the former Warden of Apalachee Correctional Institution, Al Solomon, (2) Dr. Daniel Cherry, the former Regional Medical Director for Region I, (3) Dr. H. V. Pandit, and (4) Ann Welch, a dental assistant formerly at Apalachee Correctional Institution.  Doc. 25; *see also* doc. 60, pp. 1-2.  Plaintiff alleges that he entered the custody of the Florida Department of Corrections in March of 2001 and during the initial health screening, notations were made indicating he had several cavities, T.M.J. disorder, bleeding gums, cracked or broken teeth, and headaches due to poor dental health, and Plaintiff needed treatment. Doc. 25, p. 8.

Plaintiff complains that he was in pain and was suffering, but could not get dental care.  *Id.*  Plaintiff's grievances were denied; he states that when he would go to dental sick call he was told his treatment was up to the dentist and he needed to wait until his name came up on the dental treatment call-out list.  *Id.*  He contends that this list was very long and it would take anywhere from six months to a year for him to receive care due to staff shortages and budget cuts.  *Id.*  Plaintiff was refused passes for a soft diet

and to permit slow eating, which he contends he needed and which would have alleviated his pain and suffering. *Id.*

Plaintiff further claims that he was subjected to retaliation because he filed grievances and when he was given treatment after going to sick call, he intimates that Defendants deliberately caused him excessive and additional pain when providing cursory treatment. *Id.*, at 9. Plaintiff seeks nominal, compensatory, and punitive damages as well as injunctive relief for his First and Eighth Amendment claims. Doc. 25.

**Defenses**

Defendants contend that Plaintiff's complaint must fail because Plaintiff did not have a serious medical need. Doc. 60, p. 14, *et seq.* Additionally, Defendant Solomon asserts that he "has no knowledge or dental expertise as to the dental issues raised by the Plaintiff, [and so] no causal connection can exist between Defendant Solomon and the actions taken or not taken by the Dental Department," precluding liability under § 1983. *Id.*, at 16. Defendant Cherry similarly asserts that he was not "personally involved in the alleged constitutional deprivations" and cannot be held liable. *Id.*, at 16-17. Additionally, Defendants Solomon and Cherry argue that they cannot be held liable by *respondeat superior. Id.*, at 18.

Defendant Welch contends that verbal abuse is insufficient to state a claim under § 1983 and she contends that she provided appropriate and professional dental treatment under the direction of the dentist. *Id.*, at 19. Defendant Welch further claims that she did not have the authority to grant Plaintiff the relief he sought, such as a "soft

diet pass" or "slow eating pass."  *Id.*, at 20.  Defendant Welch denies retaliating against Plaintiff and contends Plaintiff received appropriate dental treatment.  *Id.*, at 23, *et seq.*

Defendants assert that Plaintiff's dissatisfaction with the delay in receiving treatment is not an actionable Eighth Amendment violation.  *Id.*, at 21.  Finally, Defendants raise qualified immunity as a defense, and contend that Plaintiff has not shown an entitlement to either compensatory or punitive damages.  *Id.*, at 29, *et seq.*

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)(citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

**Defendants' evidence**

Plaintiff entered the custody of the Department of Corrections on March 23, 2001.  Doc. 60, ex. A3.  On April 2, 2001, Plaintiff had an initial dental visual examination by Dentist Robert Holland and dental assistant Maria Alonso.  Doc. 60, ex. B.  At that time, Plaintiff was 26 years of age, five feet, eight inches tall, and weighed 176 pounds.  *Id.*  The examination reflects that plaintiff had moderate deposits on his teeth, an inflamed gingival condition, and his "masticating efficiency" was rated "fair." *Id.*  Under the category of "existing conditions," tooth 13 is noted as missing.  *Id.*  The results of Plaintiff's regional head and neck examination were all "normal."  *Id.*  Under the category of "Assessment," and sub-category of restorations, teeth numbered 1, 2, 4, and 17 are listed.  *Id.*  Plaintiff received an overall dental grade of D2.[2]  *Id.*  An affidavit

---

[2] The criteria for each of the four possible dental grades are listed in Plaintiff's exhibit F.  Doc. 65, attachment, pp. 14-15.  Dental grade I is the best, and grade IV is the worst.  *Id.*

submitted by Dentist Thomas Shields, II, states that these conditions may "be somewhat uncomfortable," but that "a large segment of the general adult population has a similar diagnosis . . . ."  Doc. 60, ex. C, ¶ 9.[3]  Indeed, such a "condition is not deemed serious, necessitating immediate medical attention."  *Id.*  He said that "restoration was indicated in tooth #1, #2, #4, and#17."  *Id.*

On April 30, 2001, Plaintiff was transferred to Lake Correctional Institution and his dental records were reviewed with Loretta Saunders, a dental assistant, and Raymond Ladwig, the dentist for Lake C.I.  Doc. 60, ex. B1.  Plaintiff sent an informal grievance on or about June 18, 2001, which was denied, and then went to sick call on June 25, 2001, complaining of a broken tooth.  Doc. 60, ex. B1.  The dentist examined Plaintiff's teeth and, in particular, tooth #4, which was "a non-restorable carious tooth (NRCT) with the root remaining."  Doc. 60, ex. B1, ex. C.  Dr. Shields states that:  "A tooth in this condition is essentially unable to be repaired and must be extracted."  Doc. 60, ex. C, ¶ 11.  Plaintiff gave his consent and tooth #4 was extracted.  Doc. 60, ex. C, ¶ 11; *see also* ex. B12.  Plaintiff had a post-operative check-up on June 26, 2001, and the dental records reflect that Plaintiff reported no problems with the extraction area.  Doc. 60, ex. C, ¶ 11; ex. B1.

Plaintiff reported to sick call on October 18, 2001, for problems with "painful wisdom teeth."  Doc. 60, ex. B3; ex. C, ¶ 12.  The examination reveal that teeth #1, #16, #17, and #32 were "all present, fully erupted and exhibited pericoronitis, an inflammation of the gingiva or gum surrounding the crown of a tooth, the worst of which

---

[3] Exhibit C, the affidavit of Dentist Thomas Shields, begins on page 27 of the attachment to document 60 on the Court's electronic docket.

was in tooth #16 and #17." Doc. 60, ex. C, ¶ 12; *see also* ex. B3. Plaintiff consented to

extraction of teeth #16 and #17, which was done on October 30, 2001. Doc. 60, ex. C,

¶ 12; *see also* ex. B13. The post-operative examination the following day revealed no

problems and Plaintiff had no complaints. Doc. 60, ex. C, ¶ 12; *see also* ex. B3.

Plaintiff was issued salt for warm saline rinses after meals for the next several days.

Doc. 60, ex. B3.

Plaintiff went to dental sick call on March 21, 2002, complaining that his wisdom

tooth was hurting. Doc. 60, ex. C, ¶ 13; *see also* ex. B3. Tooth #1 was found to be "a

non-restorable carious tooth and malposed." Doc. 60, ex. C, ¶ 13. Extraction was

recommended, *see* ex. B3, and Plaintiff consented. Doc. 60, ex. B14; *see also* ex. C, ¶

13. Again, at the post-operative check on the following day Plaintiff reported no

problems. Doc. 60, ex. B3; ex. C, ¶ 13.

On August 12, 2002, Plaintiff again went to dental sick call with complaints of

bleeding gums and two cavities. Doc. 60, ex. C, ¶ 14*; see also* ex. B4. Plaintiff was

diagnosed with gingivitis in two teeth from calculus formation and ultrasonic scaling was

provided. Doc. 60, ex. C, ¶ 14. Tooth #5 had "caries (decay)" which was partially

removed "and Intermediate Restorative Material (IRM) or a temporary filling was placed

on the tooth." *Id.; see also* ex. B4.

Plaintiff again complained of gum problems and soreness on December 17,

2002. Doc. 60, ex. C, ¶ 15. Plaintiff was given a periodic dental examination on that

day. *Id*.; *see also* ex. B5. Deposits on Plaintiff's teeth were found to be "slight, his

gingival conditions were normal and masticating efficiency was good." *Id*.; *see also* ex.

B5. Plaintiff's TMJ (faulty articulation of the temporal mandibular jaw) was also normal.

Doc. 60, ex. C, ¶ 15.  Plaintiff was given an improved dental grade of "one" at that time

by the Dentist, Dr. Newton.  Doc. 60, ex. B5.  It was noted that "tooth #5 was indicated

for restoration."  Doc. 60, ex. C, ¶ 15.  Dr. Newton "provided minor debridement and

recommended over the counter Ibuprofen, warm salt water rinses and" directed Plaintiff

to "continue a good oral hygiene regimen."  *Id.*  Dr. Shields explains that salt water

rinses have a healing effect on inflamed gingival conditions.  *Id.*

Plaintiff was transferred to Union Correctional Institution on January 22, 2003.

Doc. 60, ex. C, ¶ 16; *see also* ex. B4.  The medical records reflect that Plaintiff did not

show up for "dental orientation" on January 24, 2003.  Doc. 60, ex. B4.  On April 29,

2003, Plaintiff reported to dental sick call with a broken tooth.  Doc. 60, ex. B6; ex. C, ¶

16.  The examination found "a distal fracture in tooth #19" and the dentist "excavated

the decay and placed an IRM on the tooth."  Doc. 60, ex. C, ¶ 16.  Plaintiff was advised

to submit a request for routine dental treatment.  Doc. 60, ex. B6; ex. C, ¶ 16.  Plaintiff

again completed a dental health questionnaire indicating he was in good health and he

had not "had any prior serious trouble with dental treatment."  Doc. 60, ex. C, ¶ 16; *see

also* ex. B7.

Plaintiff arrived at Apalachee Correctional Institution, West Unit on April 30, 2003.

Doc. 60, ex. A3.  It is this period of dental care that is the subject of this complaint.[4]

On July 28, 2003, Defendant Pandit, the dentist, prepared a "dental diagnosis

and treatment plan" for Plaintiff.  Doc. 60, ex. B8; ex. C, ¶ 17.  The diagnosis indicated

---

[4] Plaintiff went to the West Unit of Apalachee C.I. on May 7, 2003.Doc. 60, ex. A3.
Over the next period of approximately two years, Plaintiff went back and forth between
Apalachee Correctional Institution, East Unit, and Pasco County for court related
events.  *Id.*, at A3-A4.  Plaintiff has not received any disciplinary actions since arriving in
the Department of Corrections.  *Id.*, at A5.

he had caries on teeth #2, #5, #12, #14, #15, #18, #19, #20, #29, #30, and #32.  Doc.

60, ex. C, ¶ 17; *see also* ex. B8.  Tooth #19 was "noted to have an IRM."  Doc. 60, ex.

C, ¶ 17.  It was also noted that Plaintiff had a history of TMJ trauma as a result of a car

accident.  Doc. 60, ex. B8.  Plaintiff appears to have been given a dental examination

and a pre-treatment rinse.  *Id.*

Plaintiff went to sick call on October 7, 2003, complaining of pain in the upper left

side of his mouth and bleeding gums.  Doc. 60, ex. C, ¶ 18.  Defendant Pandit noted

that Plaintiff had "poor oral hygiene" and "treated tooth #15 with an amalgam (or

permanent filling)."  Doc. 60, ex. C, ¶ 18; *see also* ex. B9.

On November 24, 2003, Plaintiff received a "standard pre-treatment rinse and a

four quadrant (all areas of the mouth) gross debridement or cleaning."  Doc. 60, ex. C, ¶

19: *see also* ex. B9.  A thorough cleaning must necessarily be done prior to any

restorative work.  Doc. 60, ex. C, ¶ 19.

On December 29, 2003, Plaintiff was back at dental sick call complaining of

sensitivity with tooth #30.  Doc. 60, ex. C, ¶ 20.  Plaintiff was provided another "standard

pre-treatment rinse."  Doc. 60, ex. C, ¶ 20.  Defendant Pandit "determined that tooth

#30 should receive an IRM which was placed on the tooth."  *Id.*  Defendant Pandit

believed there was "a poor prognosis for the tooth and advised [Plaintiff] that it may

have to be extracted if symptomatic."  *Id.*  Plaintiff was given a five pack of

acetaminophen Plaintiff was advised by Defendant Pandit to put in a "request for routine

care."  Doc. 60, ex. B9; ex. C, ¶ 20.

Plaintiff returned to dental sick call on January 5, 2004, again complaining that

tooth #30 hurt only when he ate and he said that he would rather have the tooth pulled.

Doc. 60, ex. C, ¶ 21; ex. B9.  Defendant Pandit did not pull the tooth at that time, but gave Plaintiff an antibiotic, Clindamycin, and Ibuprofen and rescheduled Plaintiff for monitoring.  Doc. 60, ex. C, ¶ 21.

On January 12, 2004, Plaintiff returned to dental and authorized Defendant Pandit to extract tooth #30.  Doc. 60, ex. C, ¶ 22; *see also* exhibits B10, B15.  "The extraction process included the surgical shaping of the socket cavity."  Doc. 60, ex. C, ¶ 22.  Plaintiff returned to the dental department later that day "on an emergency basis complaining of bleeding from the socket site."  *Id.*  After giving Plaintiff a pre-treatment rinse, Defendant Pandit "noted minor oozing from the site, reassured [Plaintiff] and provided a gauze pressure pack."  Doc. 60, ex. C, ¶ 22*; see also* ex. B10.  Plaintiff returned to dental the next day for a follow-up and "the extraction site was noted to be healing within normal limits with no bleeding."  Doc. 60, ex. C, ¶ 22*; see also* ex. B10.

On March 24, 2004, Plaintiff returned to the dental department, he was provided the "standard peridex rinse" and his health questionnaire was reviewed.  Doc. 60, ex. C, ¶ 23.  Plaintiff had a "four quadrant scaling and polishing and was provided oral health instructions."  *Id.; see also* ex. B10.  Dr. Kamath noted that Plaintiff was set for an appointment for amalgams on teeth #2 and #5.  Doc. 60, ex. C, ¶ 23.

On November 5, 2004, Plaintiff complained that tooth #19 was bothering him at times and was examined by Dentist Bruce Tanner.  Doc. 60, ex. C, ¶ 24; *see also* ex. B11.  "The IRM and recurrent caries were removed which were noted to be very deep but with no pulp exposure."  Doc. 60, ex. C, ¶ 24.  Plaintiff was given a permanent filling, and "advised of the guarded prognosis for saving the tooth due to it already having been symptomatic and the very deep decay present."  *Id.*  Dr. Tanner also noted that Plaintiff

would have an appointment for amalgams on teeth #12 and #14.[5]  *Id.*  On June 9, 2005, Plaintiff was transferred to Hardee Correctional Institution.  Doc. 60, ex. A4, ex. B11.

Thus, in the period of time between March, 2001, and June, 2005, Plaintiff went nine times to dental sick call for dental treatment, three of which were during his stay at Apalachee Correctional Institution.  Doc. 60, ex. C, ¶ 28.  Plaintiff also had another "emergency" appointment on January 12, 2004, after a tooth extraction.  *Id.*  In all, it appears that Plaintiff received dental treatment in one form or another on approximately twenty occasions in this four year period.[6]  This included a cleaning on November 24, 2003, and another cleaning on March 24, 2004.  Doc. 60, exhibits B-9 and B-10.  Dr. Shields summarized:  "Of the eleven teeth identified by Dr. Pandit as indicated for restoration, [Plaintiff] received treatment on three at Apalachee Correctional Institution including, a permanent filling on tooth #15 on October 7, 2003, removal of an IRM and existing decay and placement of a permanent filling on #19 on November 5, 2004 and a patient authorized extraction of tooth #30 on January 12, 2004."  Doc. 60, ex. C, ¶ 27.

Defendant Anne Welch submitted an affidavit in which she states that she "never retaliated against or threatened [Plaintiff] with bodily harm or with being locked up for

---

[5] Notably, these teeth are not the ones which were set for amalgams at the March 24th appointment.  There is no record presented in this evidence showing that teeth #2 and #5 were treated.  Nevertheless, the evidence shows Plaintiff was sent from Apalachee Correctional Institution to Pasco County on May 11, 2004, until July 2, 2004.  Doc. 60, ex. A3.  After being returned to Apalachee C.I. for just over a month, Plaintiff returned to Pasco County from August 20, 2004, until September 14, 2004.  Doc. 60, ex. A3-A4.

[6] Treatment in some form by dental providers occurred on: June 25, 2001; June 26, 2001; October 18, 2001; October 30, 2001; October 31, 2001; March 21, 2002; March 22, 2002; August 12, 2002; December 17, 2002; April 29, 2003; July 28, 2003; October 7, 2003; November 24, 2003; December 29, 2003; January 5, 2004; January 12, 2004, morning and afternoon; January 13, 2004; March 24, 2004; and November 5, 2004.

filing grievances or for using the Dental Sick Call procedure."  Doc. 60, ex. E1, ¶ 4.[7]

Defendant Welch avers that she never told Plaintiff that he "was prohibited from

returning to Dental Sick Call nor" did she ever deny or prohibit him from doing so.  *Id.*

She further states:

> I have never told [Plaintiff] that if he filed grievances or returned to Dental
> Sick Call he would be punished or that his name was going to the bottom
> of the dental callout list, nor did I punish him or place his name at the
> bottom of the dental call out list for filing grievances or accessing Dental
> Sick Call.  I have never used a Disciplinary Report as a threat or retaliation
> against [Plaintiff] for filing grievances or accessing sick call.

Doc. 60, ex. E1, ¶ 4.  Additionally, Defendant Welch avers that she never yelled or

screamed at Plaintiff, nor did she "ever intentionally allow [her] saliva to fall into

[Plaintiff's] open mouth."  *Id.*, at ¶ 5.  Indeed, she states that she is "required to wear

personal protective equipment including protective face wear when treating inmate

patients in the Dental Department."  *Id.*

Defendant Welch also clarifies in her affidavit that she is not "authorized or

trained to perform tooth extractions" and cannot make final decisions about whether to

save or extract a tooth.  Doc. 60, ex. E1, ¶ 6.  She is also "not authorized to either grant

or deny soft diet or slow eating passes."  *Id.*  Defendant Welch, who has worked as a

dental assistant for some 36 years, provides dental treatment "only under the authority

and at the direction of the institutional dentist" and has "never intentionally caused an

inmate's tooth to be broken during an extraction . . ."  *Id.*  She states that she has never

"refused or denied needed dental treatment to an inmate patient" and denies all of

Plaintiff's allegations.  Doc. 60, ex. E.

---

[7] Exhibit E begins on page 44 of the attachment to document 60.

Defendants' evidence also contains an affidavit from Daren Hatfield, who worked as a Dental Assistant at Apalachee Correctional Institution from December, 2002, until October, 2004.  Doc. 60, ex. H, ¶ 3.[8]  Mr. Hatfield reports that he worked with Defendant Welch in the Dental Department and "never heard her express nor have I ever seen her engage in any type of retaliation against an inmate patient for filing grievances or accessing Dental Sick Call."  *Id*., at ¶ 5.  Mr. Hatfield states that he never saw her "place any inmate's name at the bottom of the Dental call out list nor" did he ever hear "her express or indicate any desire to do so, as a result of an inmate patient filing grievances or coming to Dental Sick Call."  *Id.*

As additional evidence from Defendants, Defendant Cherry submitted his own affidavit.  Doc. 60, ex. D.[9]  Defendant Cherry states that in the relevant period, he was "the Regional Medical Director for Region I and the acting Chief Health Officer at Apalachee Correctional Institution."  Doc. 60, ex. D, ¶ 9.  He further says that he "had oversight responsibility over the delivery of health services for all inmates in Apalachee Correctional Institution."  *Id.*  As part of those duties, Defendant Cherry provided the responses to formal grievances filed by inmates which were concerned with medical or dental issues.  *Id.*

On three occasions, Defendant Cherry responded to formal grievances filed by Plaintiff.  Doc. 60, ex. D, ¶¶ 11-13.  The responses "were based on information provided to [Defendant Cherry] from the dental record in this case."  Id., ¶ 10.

---

[8] Exhibit H begins on page 54 of the attachment to document 60.

[9] Exhibit D begins on page 39 of the attachment to document 60.

Defendants have provided copies of Plaintiff's grievances.  Doc. 60, ex. I.[10] Plaintiff filed an informal grievance on July 18, 2003, complaining that inmates should have their teeth cleaned every six months and noting that he had been three years without a cleaning.  Doc. 60, ex. I.  He complained that his teeth "always hurt" and he wanted an appointment to have his teeth fixed.  *Id.*  The reply advised him that he was "assigned for active treatment by dental at [that] time" and would be put on the callout when it was his turn.  *Id.*  The reply also advised that if Plaintiff was "having a dental problem, use dental sick call procedures."  *Id.*  The officials who signed the reply were Defendants Welch and Pandit.

On August 15, 2003, Defendant Cherry responded to Plaintiff's July 29, 2003, formal grievance (an appeal of the informal grievance identified above) in which Plaintiff complained about the length of time it would take to receive treatment for cavities.  Doc. 60, ex. I3.  Defendant Cherry advised Plaintiff that he was scheduled for dental treatment and would be placed on a call out list when his turn arose and that, in the meantime, Plaintiff could go to dental sick call if he was having a dental problem or needed urgent dental assistance.  *Id.; see also* doc. 60, ex. I3.[11]

Defendant Cherry provided another response on October 31, 2003, to Plaintiff's formal grievance filed on October 19, 2003.  In that grievance, Plaintiff alleged that Defendant Welch had told Plaintiff he could not have all his dental problems treated at once and that he should not make it a habit to use sick call.  Doc. 60, ex. D; *see also* ex.

---

[10] Exhibit I containing the grievances begins on page 56 of the attachment to document 60.

[11] This exhibit is found on page 59 of the attachment to document 60.

I8.  Plaintiff was again told he was "on active dental treatment and would be placed on call out when it was his turn."  Doc. 60, ex. D.  Furthermore, Plaintiff was instructed to use dental sick call if he was having a dental problem for which he had urgent dental needs.  *Id.*; *see also* ex. I8.  Defendant Cherry gave Plaintiff instruction on how to use sick call.  Ex. I8.  In addition, Defendant Cherry states in his affidavit that even *if* Defendant Welch had told Plaintiff not to make a habit of using sick call, such a comment would not be improper because sick call is for dental needs which are of an urgent or emergency nature.[12]  Doc. 60, ex. D, ¶ 14.  Dr. Cherry states that dental sick call is not the appropriate method of obtaining routine dental treatment.  *Id.*

The third formal grievance to which Defendant Cherry responded was filed by Plaintiff on October 13, 2004; the response was provided on October 25, 2004.  Doc. 60, ex. D; *see also* ex. I11.  In this grievance, Plaintiff claimed he had not had any dental care in over sixteen months and reported that the Dental Department would not fix his cavities or TMJ.  Doc. 60, ex. I12.  Plaintiff was advised that his dental records contradict his claim, that Plaintiff had been treated five times in 2004 alone.  *Id.*  Further, the response stated that when it was Plaintiff's turn for more dental work, his name would be placed on the call out and he would receive additional treatment.  *Id.*

Defendant Cherry testified in his affidavit that he reviewed Plaintiff's complaint on May 3, 2005, about pain in his jaw.  Doc. 60, ex. D, ¶ 15.  Plaintiff's condition was examined and "there was no crepitus in the jaw and no dental abscess was noted."  *Id.*  Finally, Defendant Cherry states that a special diet pass cannot be authorized by

---

[12] As part of Plaintiff's evidence he presented a general information bulletin which provides a list of conditions which constitute a dental emergency.  Plaintiff's exhibit F-6 (document 65, attachment).

medical staff such as a dental assistant.  Doc. 60, ex. D, ¶ 16.  Defendant Cherry also affirmatively testified that he "did not retaliate in any manner against [Plaintiff] for filing any grievances."  *Id.*, ¶ 17.

Defendant Solomon submitted an affidavit in which he states he is "not a medical doctor, dentist or health care professional" and during the relevant time period, he was the Warden at Apalachee Correctional Institution.  Doc. 60, ex. F.  While acting in that capacity, Defendant Solomon would review inmate grievances and, when faced with a grievance concerning medical or dental issues, he "would refer the grievance to the Chief Health Officer of the institution for review and a response."  Ex. 60, ex. F, ¶ 3.  As for Plaintiff's formal grievances, Defendant Solomon avers that he "would not have been the most knowledgeable or informed staff member to respond" because they were of a medical nature and so he "referred those formal grievances to the Chief Health Officer."  *Id.*, at ¶ 4.  The Chief Health Officer then "provided the responses to" Plaintiff's grievances.  *Id.*  He avers that he "never intentionally caused" Plaintiff to "be deprived of dental care of retaliated against" in any way for filing grievances.  *Id.*, at ¶ 7.

Defendant Solomon also stated that while he was the Warden, he "did not have any policy in place that set a specific time limit that inmates were permitted to eat their meals."  Doc. 60, ex. F, ¶ 6.  Another affidavit by Charles Halley, a correctional officer Colonel and Chief of Security at Apalachee Correctional Institution during the relevant time, supports that assertion: "During the time I was assigned to Apalachee Correctional Institution, I was unaware of any policy that set a specific time limit for inmates to eat their meals."  Doc. 60, ex. G, ¶ 2.

As noted above, *see* footnote 12, Plaintiff provided evidence to define a dental emergency and a valid reason for an inmate to appear for dental sick call.  Doc. 65, attachment (exhibit F-6).  There are six dental emergencies for which no co-payment is assessed: (1) Dental problems relating to a current trauma situation; (2) Current injury; (3) Fractures; (4) Visible swelling/cellulitis; (5) Uncontrolled bleeding from the oral cavity; and (6) Post-operative complications from recent dental treatment.  Plaintiff's Exhibit F-6.  The following problems are deemed to *not* be dental emergencies but would warrant a sick-call visit: (1) Tooth sensitivity; (2) Broken dentures; (3) Most denture adjustments; (4) Ill-fitting dentures; (5) Crown and bridge repairs; (6) Broken or lost fillings; and (7) Bleeding gingiva due to poor oral hygiene or periodontal conditions. Plaintiff's exhibit F-7.

Plaintiff has also provided as evidence his own "declaration in opposition to Defendants' motion for summary judgment."  Doc. 65.  Plaintiff's statements within his declaration are said to be "true and correct to the best of his knowledge under oath" and this will be considered as the equivalent of an affidavit.  *Id.*  Plaintiff states that after entering the custody of the Florida Department of Corrections in March of 2001, he had a dental examination.  Doc. 65, p. 3.  Plaintiff told the dentist of pain from certain teeth, complained of bleeding gums, and a T.M.J. problem.  *Id.*  Plaintiff states that the dentist told him following the examination that he had poor dental health, that he "had several cavities started, rotten teeth, wisdom teeth that would need to be pulled, that the bleeding gums were caused by some form of illness, that the poping [sic] was due to

T.M.J. . . . ."[13]  *Id.*  The dentist indicated to Plaintiff that the problems were noted in his

dental record and when he got to his permanent housing facility, he would be treated.

*Id.*  Plaintiff states "it was noted that" he had a "severe problem" with his teeth being

sensitive to hot and cold, but that this notation is not included in the medical records

which were provided by Defendants.  *Id.*

Plaintiff acknowledges that in the nearly two year period he was housed at Lake

Correctional Institution (April 30, 2001, until January, 2003), he informed dental staff of

his pain, headaches, and the fact that his "gums were always bleeding."  Doc. 65, p. 3.[14]

Plaintiff believes that his condition worsened, however, and that his cavities are "very

deep."  *Id.*, at 3-4.  Plaintiff states that he does not "know all his treatment he received"

while at Lake Correctional Institution, but will agree to Defendants' statement of the

dates of treatment.  *Id.*, at 3.

Plaintiff avers that he uses the tooth brush and toothpaste he is given from the

Department of Corrections and "brushes his teeth three to four times daily."  *Id.*, at 4.

He complains that no dental floss or mouthwash is given to inmates.  *Id.*[15]

---

[13] This is hearsay evidence that Plaintiff had these conditions, but the hearsay is not
inconsistent with the medical record discussed above.  There is no need to more
precisely identify inadmissible hearsay in Plaintiff's affidavit where, as here, the
evidence is not in conflict.

[14] The complaint does not present any claims against officials from either Lake
Correctional Institution or Union Correctional Institution.

[15] Plaintiff submitted documentary evidence, however, which states that inmates are
provided oral hygiene supplies of "a toothbrush, dentifrice containing fluoride, and a
type of floss product."  Doc. 65, attachment, exhibit E-2.  Furthermore inmates are given
"standardized toothbrushes by the Department of Corrections at no cost."  Doc. 65,
attachment, exhibit F-15.  Toothpaste is also given free to inmates, and consists of a
fluoride "free of animal products" and a "Desensitizing toothpaste."  *Id.*, at F-16.

Plaintiff acknowledges having one tooth pulled while at Union Correctional Institution and states that because he was only there for approximately four months, there was not sufficient time to treat his extensive problems. *Id.*, at 4. After he arrived at Apalachee Correctional Institution, his avers that his "dental conditions and pain were unbearable." *Id.*, at 4. By July, 2003, Plaintiff submitted an informal grievance complaining, *inter alia*, that a filling had fallen out and he was in pain. *Id.; see also* doc. 60, ex. I. Plaintiff states that it took until November 5, 2004, to get a filling for that tooth. Doc. 65, p. 5. Plaintiff complains in his declaration that he had to "suffer in pain for sixteen months when [Defendants] Welch and Pandit knew of this filling and its pain." *Id.* Plaintiff states that they had the ability to fix this problem but "refused to do so and told Plaintiff to wait till his name came up on the dental list." *Id.* Plaintiff also states that Defendant Welch makes "all appointments and decided if you got to see the dentist." *Id.*, at 5. Plaintiff asserts that "just because you go to dental sick call does not mean you see the dentist." *Id.* He claims that Defendant Welch decides whether the inmate can see the dentist." *Id.*; *see also* p. 7. Plaintiff asserts that Defendant Welch would place his "name at the bottom of the dental list when he would go to sick call or write a grievance." *Id.,* at 5. Plaintiff also asserts that Defendant Welch told Plaintiff "she did these actions." *Id.*

Plaintiff claims that on July 26, 2003, he was called to the dental department and upon his arrival, Defendant Welch told Plaintiff "in an angry and very hostile manner that Plaintiff better not write anymore grievances against dental if Plaintiff knew what was good for his health and safety." Doc. 65, at 5. Plaintiff states that Defendant Welch told him she would have him "locked up, make Plaintiff's life miserable for his while stay at

A.C.I., and that she would personally have security knock out Plaintiff's teeth." *Id.*, at 5-6.

Plaintiff asserts that on July 28th, x-rays of his teeth were taken by Defendant Welch and Defendant Pandit conducted an examination. Doc. 65, p. 6. Plaintiff states that he told both Defendants Welch and Pandit that he was in "severe pain, suffering and discomfort" and reported that his teeth were overly "sensitive to hot and cold and hurt when chewing hard foods." *Id.* Plaintiff states that both Defendants acknowledged his eleven cavities, and said Plaintiff had "very poor dental health." *Id.* Plaintiff also states that both Defendants "Pandit and Welch were amazed how badly Plaintiff['s] jaw would pop when he made a chewing motion or yawned" and noted that Plaintiff's mouth would not open very wide due to his T.M.J. Doc. 65, pp. 6-7. Defendants told Plaintiff he would require dental treatment but said no work would be done anytime soon because they were backlogged. *Id.*, at 7.

On another occasion, Plaintiff states that Defendant Welch verbally harassed him and said that prisoners should not get free dental care while taxpayers have to pay hundreds and thousands of dollars to get the same dental care. Doc. 65, p. 7. Plaintiff asserts that Defendant Welch told him "if it was up to her no inmate would get dental care period." *Id.*

Plaintiff further avers that Defendants Solomon and Cherry were aware of his problems through the grievance process, but Plaintiff states that they "did nothing not even any investigation." Doc. 65, p. 5. Plaintiff complains that Defendants Solomon and Cherry denied his grievances. *Id.*, at 7-8; *see also* doc. 60, ex. I1-I3.

On another occasion, October 7, 2003, Plaintiff went to sick call complaining that three teeth were causing pain and bleeding.  Doc. 65, p. 8.  Both Defendants Pandit and Welch told Plaintiff they did not have time to deal with all three teeth and the gum problem, and said they could look at one tooth or the bleeding gums.  *Id.*  Plaintiff states that Defendant Welch was "yelling and screaming at Plaintiff while his mouth was clamped open and her spit was flying into [his] mouth."  *Id.*  Plaintiff also states that Defendant Welch again told him not to make a habit of coming to dental sick call but to wait until his name came up on the list.  *Id.*  She further threatened Plaintiff by saying she would have Plaintiff "locked up and security put on him."  *Id.*

Plaintiff states that Defendant Welch advised that Defendant Pandit was the only dentist for over eleven hundred inmates and that she and Dr. Pandit could not "keep up with the dental needs."  Doc. 65, p. 9.  Additionally, Defendant Pandit provided dental services at another prison one to two days per week which also limited the opportunity for dental care at Apalachee Correctional Institution.  *Id.*  Plaintiff's formal grievance on October 9th complaining about the delay in treatment was also denied.  *Id.*

At the end of December, 2003, and the early part of January, 2004, Plaintiff avers that he was "in severe pain from a cavity that Defendants Pandit and Welch knew about but flat out refused to fix this cavity on pervious [sic] visits and request by Plaintiff."  Doc. 65, p. 10.  Plaintiff contends that Defendant Welch "got into" Plaintiff's face, was furious, and directed the Dentist (Defendant Pandit) to only put a temporary filling in Plaintiff's tooth to save time and money.  Defendant Welch, the dental assistant, told Plaintiff that he did not "deserve even a temporary filling because Plaintiff was a prisoner and a complaining cry baby."  *Id.*  Plaintiff reports that Defendant Welch then

verbally accosted him and threatened him if he disobeyed her by coming to dental sick call.  *Id.*  She also said that she "was going to put Plaintiff's name at the very bottom of the dental treatment list" and every time Plaintiff came to dental sick call, it would again go to the very bottom of the dental list."  *Id.*  Furthermore, Defendant Welch told Plaintiff that if he wrote any grievances, his name would be "placed dead last on the dental treatment list."[16]  Plaintiff contends Defendant Pandit watched and heard all of this but did nothing.  *Id.*

On January 5, 2004, Plaintiff went to dental complaining about stabbing pain where the tooth was filled and said he could not chew his food.  Doc. 65, p. 11. Defendant Welch yelled at Plaintiff that he was faking and started to issue Plaintiff a disciplinary report for lying, but Defendant Pandit said that he had "drilled the Plaintiff's tooth to [sic] deep and the filling was hitting the tooth[']s nerve."  *Id.*  Defendant Welch told Plaintiff there was nothing wrong with him and he just wanted to "write up complaints and complain."  *Id.*  Defendant Pandit said that he would "just pull the tooth so Plaintiff won't come back anymore about it."  *Id.*  Plaintiff asked whether the tooth couldn't be saved, but Defendant Pandit told Plaintiff he could either get the tooth pulled

---

[16] An exhibit provided by Plaintiff indicates that each institutional dental clinic is required to submit written monthly reports by the seventh day of the following month which provides the following information: (1) "approximate initial waiting time for routine/comprehensive dental care," (2) "approximate waiting times between appointments for routine/comprehensive dental care," and (3) number of provider days per practitioner and an institutional total of provider days."  Doc. 65, attachment, exhibit F-9.  None of these reports have been provided.  Presumably, these reports could document whether or not Plaintiff's name was moved to the bottom of a list.

or Defendant Welch would write Plaintiff a disciplinary report.[17]  *Id.*  "Defendant Welch

started laughing and said see what complaining gets you."  *Id.*

Plaintiff states that he was called back to dental to get his tooth pulled on

January 12th.  Doc. 65, p. 11.  Plaintiff further testified that "Defendant Pandit refused to

give the plaintiff enough medication to numb [his mouth] and when Plaintiff told

Defendant Pandit [sic] Defendant Welch told Plaintiff to shut up and said your [sic] lucky

your [sic] getting anything."  *Id.*  Plaintiff claims that "in an angery [sic] manner

Defendant Pandit took a dental tool and broke plaintiff's tooth into pieces and then had

to dig them out."  *Id.*  Plaintiff reports that Defendant Pandit did not even try to pull the

tooth.  *Id.*  Defendants Pandit and Welch again told Plaintiff to he would "learn to stop

writing grievances."  *Id.*

After removal of this tooth, Plaintiff developed dry socket.  Doc. 65, p. 12.

Plaintiff reports that it was very painful, food kept getting in it, there was bleeding, and it

became infected.  *Id.*  Plaintiff avers that Defendants Welch and Pandit refused to treat

the infection.  *Id.*  Defendants Pandit and Welch also denied Plaintiff a "soft diet pass"

and told him that he did not deserve the pass because all he does is write grievances

and complain about dental.  *Id.*

On January 13, 2004, Plaintiff was transferred to a jail in Land O' Lakes, Pasco,

County, Florida.  Doc. 65, p. 12.  Medical staff at the jail treated Plaintiff on January 16,

2004, for the dry socket and infection.  *Id.*  He was given medications, but because the

---

[17] Inmates who do not want to have the treatment recommended by the dentist is to
be documented on a CD4-700A form.  Doc. 65, attachment, exhibit F-15.  The example
given in that Information Bulletin (Number 15.04.13) is when an inmate reports to sick
call and "is informed that an extraction is required and the inmate refuses to have it
done."  *Id.*

pain and infection got worse, Plaintiff went back to the medical sick call at the jail.  *Id.*

The dentist for the jail examined Plaintiff on or about January 21st, and confirmed that

the dry socket was infected.[18]  *Id.*  This dentist also told Plaintiff that part of his pain was

from tooth #32 which was "rotted [sic] below the gum line" and pulled the tooth.  Doc.

65, pp. 12-13.  Plaintiff asserts that Defendants Pandit and Welch both knew that tooth

#32 was hurting when they pulled tooth #30, but they would not bother with this tooth at

that time.  *Id.*  Plaintiff avers that both teeth could have been fixed on the same day.  *Id.*,

at 13.

Plaintiff states (without identifying a specific date) that when he was returned to

Apalachee Correctional Institution and was "being processed back in" he saw

Defendant Welch in medical and told her what happened with his dry socket and

infection.  Doc. 65, p. 13.  Defendant Welch told Plaintiff she did not care what had

transpired or what the county jail dentist had to say because Plaintiff was back in DOC

custody.  *Id.*  She again stated that Plaintiff "better not come to sick call with all this

crap" and told Plaintiff he would have to wait until his turn came up.  *Id.*  Defendant

Welch then "tore up the dental sick call slip Plaintiff had in his hand, and refused to see

Plaintiff."  *Id.*[19]

Plaintiff asserts that it has been over thirty months since Plaintiff initiated the

grievance process and, to date, "only three teeth have been fixed or repaired."  Doc. 65,

---

[18] Plaintiff asserts that due to his indigency, he cannot "afford to obtain the dental records from the county jail in Pasco County."  Doc. 65, p. 13.

[19] It is unclear from Plaintiff's statements concerning this incident whether he was attempting to report to a dental sick call, or simply being "processed" back into the institution.  Doc. 65, p. 13.  Nevertheless, this evidence will be viewed in the light most favorable to Plaintiff.

p. 14.  Plaintiff contends he had eleven cavities, bleeding gums, and a T.M.J. problem, and states that his bleeding gums and T.M.J. problem have never been addressed.  *Id.*

Plaintiff acknowledges, however, in his declaration that he was transferred from Apalachee Correctional Institution after approximately twenty-five months and that he is having to wait for treatment there.  *Id.*, at 14.  Plaintiff contends that he will have to wait between eight to twelve months for dental treatment there as well.  *Id.*  He complains that all but one time Plaintiff had to access sick call for treatment, and then avers that he would have to return for follow up care because "treatment was not done or completed or Plaintiff had complications."  *Id.*

Additionally, Plaintiff contends that Defendant Solomon only allowed inmates five minutes to eat their meals."  Doc. 65, p. 14.  Plaintiff states that Defendant Solomon was fully aware of this practice and allowed it to continue.  *Id.*  Furthermore, Plaintiff suggests that there may not have been a policy giving only five minutes to eat, but that this was the practice which was in place.  *Id.*  Plaintiff further states that this practice "made it hard for Plaintiff to get meals and Plaintiff had digestion problems which caused Plaintiff severe pain and suffering from cramps."  *Id.*  Plaintiff avers that he lost over ten pounds.  *Id.*

Plaintiff has provided several affidavits from other inmates with his declaration. Doc. 65, attachment (Plaintiff's exhibit A-1).  The first affidavit, by Marcus Sosa, does not allege any actions or inactions by any Defendant in this case.  *Id.*, at p. 1. Therefore, the affidavit is irrelevant for purposes of summary judgment.

Inmate Madison Bohannon states in his affidavit that Defendant Welch told him not to go to dental sick call, but to wait until his name came up on the treatment list and

he would receive a callout.  Doc. 65, attachment, p. 2 (Plaintiff's exhibit A-2.  This

inmate asserts there is a "one year plus waiting period."  *Id.*  Further, he contends that

because there is no full-time dentist at the Institution, "dental sick-call is only open two

days per week."  *Id.*[20]  Finally, he asserts that staff only allows "you less than 10

minutes to eat."  *Id.*

Another affidavit by inmate Jimmy Miller presents similar information, that there is

a long waiting list for dental care, that dental sick call is only available two days per

week and that there is no full time Dentist at Apalachee Correctional Institution.  Doc.

65, attachment, p. 3 (Plaintiff's exhibit A-3).  Miller also asserts that inmates are

"allowed less than ten minutes to eat each meal."  *Id.*[21]

A affidavit by inmate Remese Jackson makes similar statements about the

waiting time for dental care.  Doc. 65, attachment, p. 4 (Plaintiff's exhibit A-4).  This

inmate also states that he had been "turned down for dental care for painful dental

conditions such as swollen gums[,] infected teeth, and cavities," but he does not allege

a connection between that situation and any named Defendant.  *Id.*

Plaintiff  presented his own affidavit.  Doc. 65, attachment, p. 5 (Plaintiff's exhibit

B).  Plaintiff states that he wrote grievances concerning the lack of needed dental care

and being in pain.  *Id.*  Plaintiff personally told Defendants Welch, Pandit, and Solomon

---

[20] His claim of being the victim of abuse for writing grievances is not specific to any
named Defendant.

[21] To the degree that the affidavit makes assertions that threats are made by
Defendant Welch, the affidavit does not demonstrate that the affiant has personal
knowledge of such or that affiant experienced the event personally and, therefore, those
statements are not sufficient for summary judgment purposes.  A broad claim that a
Defendant takes certain actions is insufficient unless the affiant shows a personal basis
for that knowledge.

those allegations as well.  *Id.*  Plaintiff states that Defendant Welch told him that if he "wrote anymore grievances or kept coming to dental sick call she would have security knock out [his] teeth, place [him] into confinement and . . . make [his] life miserable."  *Id.*  Plaintiff contends that Defendant Welch told him "each time [Plaintiff] came to dental sick call or wrote any grievance she would put my name at the bottom of the dental treatment list which was 6 to 12 months long."  *Id.*  Defendant Welch told Plaintiff on several occasions that he would be put on the bottom of the list for going to dental sick call or writing grievance.  *Id.*  Plaintiff states that Defendant Welch threatened to write him a disciplinary report "for lying to staff when [he] complained about a tooth that was filled and still hurting."  *Id.*

Plaintiff also states that Defendant Pandit told him "he was going to pull [Plaintiff's] tooth and if [Plaintiff] did not let him, [he] would get a disciplinary report."  Doc. 65, attachment, p. 5.  Plaintiff contends that both Defendants Welch and Pandit refused to give him a soft diet pass while he had a dry socket.  *Id.*  Plaintiff contends that Defendants Pandit and Welch refused to give him enough medication to numb his mouth and that Defendant Pandit "purposely" brook his tooth instead of just pulling it.  *Id.*, at 5-6.  Plaintiff states that Defendant Pandit also "tore [his] gums away from [his] teeth on one side of [Plaintiffs] mouth."  *Id., at* 6.  Plaintiff states that Defendant Welch told him that he was lucky to get anything and said Plaintiff "would learn to stop writing grievances."  *Id.*

After being sent to Pasco County jail and then returning to Apalachee C.I., Plaintiff states that Defendant Welch told him not to come to sick call and to wait until his turn came up.  Doc. 65, attachment, p. 6.  Plaintiff states that in his approximately

twenty-five month incarceration at Apalachee Correctional Institution he only had "three teeth treated out of eleven cavities, [his] bleeding gums, T.M.J.[,] nine cavities, headaches and sensitive teeth have never been addressed." *Id.* Finally, Plaintiff avers that staff only allowed "inmates five minutes to eat their meals" and this caused Plaintiff to "not be able to eat and have digestive problems which were painful." *Id.*

Additionally, Plaintiff provided a copy of an inmate request indicating he went to the dentist with "severe pain" in the left side of his mouth and the dentist told Plaintiff he had an infection and the tooth was "so bad it must be pulled." Doc. 65, attachment (Plaintiff's exhibit C). The request also stated that the x-rays which were taken showed Plaintiff have a cavity, but the dentist told Plaintiff it could not be fixed anytime soon as he was the only dentist for some 1,400 inmates. *Id.* Plaintiff asked how long the wait would be for treatment. *Id.* The response was that Plaintiff was scheduled for the extraction on September 22, 2005, and the average wait was currently "between 8 - 12 months." *Id.*[22] The tooth that was pulled was tooth #19, the one that had been filled on November 5, 2004. *Id.*

Plaintiff also filed a Technical Instruction bulletin number 15.04.03, with an effective date of March 7, 2001, which provides "Guidelines for Dental Periodic Oral Examinations." Doc. 65, attachment, p. 8 (Plaintiff's exhibit D). That document indicates that dental "periodic oral examinations shall be done every two years" for inmates under age 50. The periodic oral examination is "not required," however, for an inmate who "is receiving active/comprehensive dental care . . . ." *Id.* "Active/

---

[22] It is noted that the request concerned treatment at Hardee Correctional Institution, not the institution at issue in this case and, more importantly, there is no involvement by any Defendant in this case.

comprehensive dental care means an examination, radiographs, diagnosis, and a written treatment plan have been completed and treatment is being provided per the treatment plan."  *Id.*  "Sick call and/or emergency visits are not considered active/comprehensive care, and will not affect the periodic oral examination date."  *Id.*  The periodic oral examination may only be performed by a dentist.  *Id.*, at 9.  Inmates are to submit an inmate request form for "routine dental treatment."  *Id.*

Technical Instruction bulletin number 15.04.02, effective on March 6, 2001, states:  "All Department of Corrections dental clinics shall hold daily sick call to provide dental access to those inmates who cannot wait for a routine appointment and, yet, do not meet the criteria for emergency care."  Doc. 65, attachment, p. 11 (Plaintiff's exhibit E).  Emergency care includes "trauma, emergency extractions, pulpectomies, control of bleeding, acute infection, swelling, and severe cellulitis."  *Id.*  Preventive dental supplies which are available to inmates "include a toothbrush, dentifrice containing fluoride, and a type of floss product."  *Id.*  Inmates are to be given "education in the use of oral hygiene supplies."  *Id.*  Regular or routine dental treatment "generally consists of routine extractions, restorations, prophylaxis, periodontal treatment, endodontics, and prosthetics."  Doc. 65, attachment, p. 25 (Plaintiff's exhibit F-13).  When an inmate submits a request for dental care, his or her name is "placed on a list of individuals awaiting services on a first-come, first-served basis."  *Id.*  There is, however, a priority exception for inmates who are "deemed by the dentist to be in urgent need of dental care" or have insufficient "teeth for proper mastication of food."  *Id.*

Another Technical Instruction bulletin provides information as to the ability of dentists to order special diets for an inmate due to dental problems.  Doc. 65,

attachment, p. 17 (Plaintiff's exhibit F-5).  Instruction 15.04.13 provides that "dentists may order only liquid, puree, or mechanical dental diets."  *Id.*  If any other diet is medically indicated, "the inmate should be referred to the medical department."  *Id.*

Plaintiff also relies upon Technical Instruction bulletin number 15.04.14, effective on March 7, 2001.  Doc. 65, attachment, pp. 30-33 (Plaintiff's exhibit G).  That document states that a "dental assistant shall always be supervised by the dentist or the dental hygienist."  *Id.*, at p. 30.  It also specifies that inmates are to be given an initial dental examination and periodic dental examinations.  *Id.*, at 31.  The dental assessment and treatment plan must give inmates a dental grade which is used to establish "the priority of treatment needs."  *Id.*  (Plaintiff's exhibit G-2).  As noted above, Plaintiff's initial assessment on April 2, 2001, was dental grade two.  At his periodic examination on December 17, 2002, it was determined that Plaintiff had improved to a dental grade one.

**Analysis**

Plaintiff has not presented any evidence to show that Defendant Welch was intentionally spitting at or upon Plaintiff.  Plaintiff only asserts that Welch failed to wear safety equipment and, while yelling at Plaintiff, "her spit flew into Plaintiff's mouth."  An accident of this sort, even though unpleasant (assuming it to be true), is minor negligence at most and not a violation of the Eighth Amendment.  Davidson v. Cannon, 474 U.S. 344, 347, 106 S.Ct. 668, 671, 88 L.Ed.2d 77 (1986).  Defendant Welch is entitled to summary judgment in her favor as to this claim.

Plaintiff has also attempted to present a claim in response to the motion for summary judgment that Defendant Welch would not allow Defendant Pandit to use the

"proper amounts of numbing medication when a tooth was pulled." *See* doc. 65, p. 20.[23]

How a dental assistant would be able to cause this to occur has not been explained.  In

any event, this claim was not part of the second amended complaint, doc. 25.  Further,

Plaintiff did not file any grievances making this specific claim.  An allegation that a

medical provider intentionally failed to use proper numbing medication so that the

patient was intentionally in pain is a separate constitutional claim from the others,

alleging delay in or failure to provide treatment, and retaliation.  Because these

allegations has never been presented in the grievance process, this claim cannot be

made part of this case at this point in the proceedings.  42 U.S.C. § 1997e(a).

Plaintiff also raises a separate claim in the response to Defendants' motion for

summary judgment that Defendants Pandit and Welch refused to treat an infection and

dry socket that developed after Plaintiff's tooth #30 was pulled on January 12, 2004.

The evidence reveals that Plaintiff was examined later that day, after he complained of

a problem.  At that point, medical personnel did not find any signs of an infection, just

"minor oozing" and bleeding from the socket.  The evidence is that Plaintiff was

examined, given a gauze pressure pack, and after some reassurance, Plaintiff was

released.  Plaintiff was examined the following day and the medical evidence shows his

condition was normal and the extraction site "healing within normal limits with no

bleeding."  Plaintiff left the institution the day after the extraction and was in Pasco

County when the infection would have developed.  An infection would not have

---

[23] Such a claim is also presented against Defendant Pandit in that he knew Plaintiff
was in pain but refused to give Plaintiff enough medication.  This report and
recommendation, however, is not addressing Defendant Pandit's separate summary
judgment motion.

developed on the day of the extraction.  These Defendants cannot be held responsible for failing to treat an infection which would have occurred outside their presence. Summary judgment should be granted in favor of all Defendants on this claim.[24]

Plaintiff's claim against Warden Solomon is premised in part on upon the assertion that this Defendant "is responsible for all staff and their actions."  *See* doc. 65, p. 22.  Warden Solomon lacks medical training.  He properly deferred to the trained judgment of medical professionals, referring the complaints to them.  He was not indifferent to Plaintiff's complaints presented in the grievances, but took action to ensure that a response was provided and the problem addressed.  Summary judgment should be granted in Defendant Solomon's favor as to this claim.

Likewise, Defendant Cherry's only involvement in this case is that he responded to three of Plaintiff's grievances.  He did not provide any direct medical care.  Defendant Cherry addressed each grievance after conducting a review of Plaintiff's dental records. Defendant Cherry undertook to ensure that Plaintiff's complaints were addressed, and did not turn a deaf ear to Plaintiff's complaints.  Defendant Cherry acted appropriately in reviewing Plaintiff's medical and dental records, confirming that Plaintiff was being provided dental care and his needs were being addressed by those persons in a position to provide treatment to Plaintiff.  Defendant Cherry was not deliberately indifferent to Plaintiff's complaints.  Summary judgment should be granted in his favor.

Plaintiff complains also that Defendant Solomon violated his Eighth Amendment rights because inmates are limited to five or ten minutes to eat meals, and this is not

---

[24] Moreover, there is no evidence of any grievance being filed concerning this event. This is a claim separate from the other claims presented in this case and cannot be litigated here because it is unexhausted pursuant to 42 U.S.C. § 1997e(a).

enough time for him to eat.  Plaintiff has presented evidence through the affidavits of other inmates that staff at Apalachee Correctional Institution give inmates less than ten minutes to eat.  Plaintiff's own affidavit states that "staff" only give five minutes for inmates who write grievances to eat meals.  Defendants' evidence is that there is no such policy concerning the time to eat meals.  In the grievance appeal number 166314 to the Secretary of the Department of Corrections on May 26, 2005, Plaintiff contended that "staff" allowed "less than six minutes to eat your food and I have to go hungry because I cannot eat enough food," doc. 60, p. 78 (Plaintiff's exhibit I 22), but Plaintiff did not mention this in the "remedy sought" section, *Id.*, p. 79, and, more important, did not make that claim in his initial grievance.  *Id.*, p. 76 (Plaintiff's exhibit I 20).  Plaintiff's claim is unexhausted and, pursuant to 42 U.S.C. § 1997e(a), cannot be litigated in this case.  Defendant Solomon is entitled to summary judgment on this claim.[25]

Plaintiff's claims that the dental staff, including Defendants Pandit and Welch, failed to give him passes for a soft diet pass or slow eating are also unexhausted. Plaintiff never brought claims concerning the inability to receive dental passes in the grievance process.  Defendants are entitled to summary judgment on this claim as well.

To the degree that Defendants Solomon and Cherry are sued because of their capacity as supervisors, the Defendants are entitled to summary judgment in their favor as a matter of law.  The doctrine of *respondeat superior* does not provide a basis for

---

[25] Additionally, even if there is such a time limit, Plaintiff claims that Defendants Welch and Pandit should have provided him with a "slow eating" pass.  It does not appear from the evidence in this case that Plaintiff made such a request to the appropriate official who had the authority to grant the request.  But even if he had, the ability to request a "slow eating" pass undercuts any claim against Defendant Solomon about the time to eat meals.

recovery under § l983.  Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir. 1992), *citing*

Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611

(1978); *see also* Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, 117 L.

Ed. 2d 261 (1992); Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S. Ct. 1292, 89 L.

Ed. 2d 452 (1986).  Defendants who merely have supervisory responsibility cannot be

held liable for the actions of officials whom they supervise, absent more, and there is no

evidence of any further personal involvement by these two officials.  These two

Defendants cannot be held liable for the actions of either Defendants Welch or Pandit.

Summary judgment should be granted in favor of Defendants Cherry and Solomon.

If the court adopts this report and recommendation, an Eighth Amendment claim

and a retaliation claim under the First Amendment will remain for analysis against

Defendant Welch.[26]  The retaliation claim will be addressed first.

**Retaliation claim against Defendant Welch**

"It is well established that a prisoner's constitutional rights are violated if adverse

action is taken against him in retaliation for the exercise of his First Amendment rights."

Pate v. Peel, 256 F.Supp.2d 1326, 1336 (N.D. Fla. 2003), *citing* Farrow v. West, 320

F.3d 1235, 1248 (11th Cir. 2003); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th

Cir.1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James,

784 F.2d 1077, 1080 (11th Cir. 1986).  Prison officials may not infringe on an inmate's

First Amendment right to petition the government for a redress of his grievances with a

practice that is "not reasonably related to legitimate penological objectives" or take

---

[26] As noted *supra*, this report and recommendation does not address the claims against Defendant Pandit.  As this Defendant has filed a separate summary judgment motion, those claims will be addressed separately.

certain actions "with the intent of chilling that First Amendment right."  Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995), *citing* Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989); *see also* Pate, 256 F.Supp.2d at 1336.  Retaliation in the prison setting may be established by demonstrating that a prison official took adverse actions against an inmate because he filed a grievance.  *See* Farrow, 320 F.3d at 1248; Pate, 256 F.Supp.2d at 1336.

A prisoner may not rely on a general attack upon a defendant's motivation, but must produce "affirmative evidence" of retaliation.  Crawford-El v. Britton, 523 U.S. 574, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998).  This requirement for such evidence exists because of "the ease with which claims of retaliation may be fabricated" by inmates and the "near inevitability" that prisoners will take exception with the decisions of prison officials.  Pate, 256 F.Supp.2d at 1336-37, *citing* Dawes v. Walker, 239 F.3d 489, 491 (2nd Cir.2001), impliedly overruled in part on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).  Nevertheless, a prisoner will not be held to a heightened burden of proof.  Crawford-El, 523 U.S. at 580-86, 118 S.Ct. 1584 (holding that in retaliation claim prisoner could not be required to show "clear and convincing" evidence of defendant's unconstitutional motives).

The Mount Healthy and Pickering decisions should guide analysis of a First Amendment retaliation claim even in the prison context.  Pate, 256 F.Supp.2d at 1339; *relying on* Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50

L.Ed.2d 471 (1977); *see also* Osterback v. Kemp, 300 F.Supp.2d 1238, 1251 (N.D. Fla. 2003).  Although that framework was established in the employment context, it is beneficial to maintain uniformity of analysis of First Amendment retaliation claims.  The employment four-step analysis is reduced to a three-step analytical framework, but continues to provide a workable standard to guide all retaliation cases.  This framework, derived in large part from the Sixth Circuit's opinion in Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999), will be applied in evaluating Plaintiff's retaliation claim against Defendant Welch.[27]  Osterback, 300 F.Supp.2d at 1252; Pate, 256 F.Supp.2d at 1337-38.  Thus, Plaintiff must demonstrate (1) that he engaged in protected First Amendment activity, (2) suffered an adverse action because of that activity, and (3) show a causal connection between the two.  If Plaintiff comes forward with such evidence, the burden will shifts to Defendants to prove that they would have taken the same actions anyway

---

[27]  Two other circuits have applied the Pickering and Mount Healthy test to First Amendment claims of retaliation in the prison setting.  Rauser v. Horn, 241 F.3d 330, 333-334 (3d Cir. 2001); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998); Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996).  The Sixth Circuit still follows Thaddeus-X. Bell v. Johnson, 308 F.3d 594, 609 (6th Cir. 2002).  Two other circuits have not adopted a burden-shifting framework, but use a more stringent "but for" analysis.  *See* Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998) (requiring prisoner to "prove that 'but for' the retaliatory motive, the incidents" which he claims were retaliatory "would not have taken place."); Goff v. Burton, 7 F.3d 734, 737 (8th Cir. 1993), *cert. denied* 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994) (declining to use Mount Healthy analysis in retaliatory transfer case and applying the more stringent "but for" test; "prisoner must prove that retaliation was the actual motivating factor for the transfer.").  The Eleventh Circuit, however, has rejected this "but for" standard for Plaintiff's proof, as noted above, so these decision are not persuasive.

Osterback v. Kemp, 300 F.Supp.2d 1253-54.  Indeed, in Osterback, it was noted that in an unpublished opinion, the Eleventh Circuit used this simplified analytical framework in considering a prisoner's claim of retaliation.  *Id.; see also* Texas v. Lesage, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (using the Mount Healthy framework in considering a § 1983 equal protection claim).

for legitimate reasons.  Since this is Defendants' motion for summary judgment,
however, and Plaintiff has the burden of proof, Defendants need only point to evidence
as to the legitimate reason and Plaintiff must show that there is a genuine dispute of
material fact concerning Defendants' defense.  *See* <u>Osterback</u>, 300 F.Supp.2d at 1254.

Plaintiff has come forward with evidence showing the first element of his
retaliation claim - that he engaged in protected First Amendment activity.  Defendants
do not dispute this point and acknowledge the administrative grievances Plaintiff filed
concerning his dental care.

As for the second element, Plaintiff has alleged that Defendant Welch threatened
him with bodily harm if he continued to write grievances.  Defendant Welch also
allegedly threatened Plaintiff with disciplinary report.  Defendant Welch allegedly
intentionally delayed treatment for Plaintiff by putting his name on the bottom of the
dental waiting list in retaliation for his grievances and use of sick call.  Furthermore,
Plaintiff presented evidence showing that both Defendants Pandit and Welch directed
Plaintiff to choose whether or not he would get a disciplinary report or have a tooth
pulled, implicitly suggesting that the tooth did not need to be pulled.  Plaintiff has also
presented evidence showing that Defendants Pandit and Welch failed to give him
sufficient numbing medication and intentionally subjected him to pain during a tooth
extraction.  This action allegedly was taken while telling Plaintiff he "would learn to stop
writing grievances."  Doc. 65, ex. B (Plaintiff's affidavit).

Defendants have asserted that Defendant "Welch makes no decisions as to
whether a tooth is to be 'saved' or not and does not provide dental services unless
authorized by the institutional dentist."  Doc. 60, p. 26.  Defendants also contend that

Plaintiff fails to demonstrate that he suffered any adverse action in response to his filing grievances. *Id.*

In light of the evidence presented by Plaintiff, there is a genuine dispute of material fact on this issue. Plaintiff has come forward with sufficient evidence showing that he was subjected to adverse consequences by Defendant Welch because of his grievances. Defendant Welch's summary judgment motion must be denied as to the retaliation claim.

**Eighth Amendment claim against Defendant Welch**

Where the alleged violation is based on a medical condition, the prisoner must demonstrate that Defendants were deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). Deliberate indifference is more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm. Farmer v. Brennan, 114 S. Ct. at 1978. Combining the standards from Farmer[28] and Estelle, the Eleventh Circuit has clarified that, "[u]ltimately, there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001).

Medical malpractice does not constitute deliberate indifference. Estelle, 429 U.S. at 106, 97 S. Ct. at 292. "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment

---

[28] Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994).

support a claim of cruel and unusual punishment." <u>Harris v. Thigpen</u>, 941 F.2d 1495,

1505 (11th Cir. 1991), *citing* <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989).

"Grossly incompetent or inadequate care can constitute deliberate indifference . . . as

can a doctor's decision to take an easier and less efficacious course of treatment."

<u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989), *citing* <u>Rogers v. Evans</u>, 792

F.2d 1052, 1058 (11th Cir. 1986); <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir.

1999).

Plaintiff presents evidence that in July, 2003, Plaintiff had a filling fall out, causing

him pain.  Plaintiff states that it took until November 5, 2004, to get a filling for that tooth.

That tooth is tooth #19.  The dental record is in conflict with Plaintiff's assertion of

fact.  The dental record discussed above shows that on April 29, 2003, Plaintiff was at

Union C. I. and had an IRM placed on tooth #19 because it was a broken tooth.  Doc.

60, ex. C, ¶ 16.  On July 28, 2003, after Plaintiff arrived at Apalachee C. I., it was noted

that Plaintiff had caries on teeth #2, #5, #12, #14, #15, #18, #19, #20, #29, #30, and

#32.  Doc. 60, ex. C, ¶ 17; *see also* ex. B8.  Tooth #19 was "noted to have an IRM."

Doc. 60, ex. C, ¶ 17.  There is no notation of any complaint of pain in tooth #19, or of

any lost filling.

Plaintiff was seen at Apalachee for dental problems on October 7, 2003,

November 24, 2003, December 29, 2003, January 5, 2004, January 12, 2004, March

24, 2004, but there is no notation of any complaint of pain in tooth #19.  The first

notation of a complaint of pain in tooth #19 is on November 5, 2004, the day a

permanent filling was placed on that tooth.  Doc. 60, ex. C, ¶ 24.

Still, through his own affidavit, Plaintiff has created a genuine dispute of material fact as to whether Defendant Welch was deliberately indifferent to his serious dental needs in general by denying him access to dental treatment for tooth #19 as well as other dental problems.  The assertion that Defendant Welch tore up a sick call request, coupled with the other assertions that Defendant Welch knew he was in pain but refused to schedule treatment for him for many dental problems,[29] is enough to survive summary judgment as to Defendant Welch.  As noted earlier, Plaintiff's factual averments at this stage of the case must be assumed to be true.  A delay of over a year for treatment of painful teeth could be found by a jury to be an Eighth Amendment violation.

Defendants' contention that Plaintiff's cavities were not serious medical needs is not persuasive.  The issue is treatment for chronic pain.  The Eleventh Circuit has recognized that "the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm."  Farrow v. West, 320 F.3d 1235, 1243-1244 (11th Cir. 2003) (other citations omitted).  There is a genuine dispute of material fact as to whether Plaintiff's dental need was such that "if left unattended, 'pos[es] a substantial risk of serious harm.' "  Farrow v. West, 320 F.3d at 1243, *quoting* Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000).

**Qualified Immunity**

---

[29]  Plaintiff also presents evidence that when he went to sick call complaining of a problem with three teeth that were causing pain and bleeding, Defendant Welch told him they did not have time to deal with all three teeth and the gum problem.

Defendants Solomon, Cherry, and Welch raise qualified immunity as a defense in this case.  Since summary judgment should be granted in favor of Defendants Solomon and Cherry for other reasons, the question arises only as to Defendant Welch.

This defense provides that a defendant is not liable for money damages if his or her conduct did not violate a clearly established right.  *See* Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002); Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. at 739, 122 S.Ct. at 2515, *cited in* Magluta v. Samples, 375 F.3d 1269, 1283 (11th Cir. 2004). "The very action in question does not have to have been found unlawful, but in light of pre-existing law the unlawfulness must be apparent."  Magluta v. Samples, 375 F.3d at 1283, *citing* Hope v. Pelzer, *supra*.

Farrow v. West, *supra*, was decided by the Eleventh Circuit on February 7, 2003, and Plaintiff's allegations against Defendants arise after that date.  That case specially concerned delay in treatment by a dentist, nurse, and dentist's supervisor.  The Eleventh Circuit refused to address defendants' claim of qualified immunity because it was not properly raised on appeal.  Nevertheless, the case is helpful for providing notice that dental claims are not insulated from Eighth Amendment claims and officials who fail to provide dental care may be held liable.  Moreover, it must be obvious to all but the most incompetent of medical providers that ignoring a claim of pain and refusing to provide treatment is unconstitutional.

To the degree Defendant Welch contends that there is no evidence that she lacks any subjective knowledge of any risk of serious harm to Plaintiff, the defense is not well taken.  Defendant's evidence is that she is a trained dental assistant and has worked in that capacity for approximately 36 years.  If Plaintiff's evidence is believed by a jury, failing to treat claims of pain, moving Plaintiff's name to the end of the list in retaliation for filing grievances, and refusing treatment all together by tearing up a dental sick call slip, would obviously amount to deliberate indifference to Plaintiff's serious medical needs relating to pain.  It has been well established for many years that an inmate may not be retaliated against for writing grievances or deliberately left in pain without medical treatment.  Because Plaintiff's evidence has created genuine disputes of material fact, qualified immunity is not available to Defendant Welch.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendants' summary judgment motion, doc. 60, be **GRANTED in part and DENIED in part**.  Summary judgment should be **DENIED** as to the First Amendment retaliation claim and the Eighth Amendment claims against Defendant Welch as identified above.  Summary judgment should be **GRANTED** as to all claims against Defendants Solomon and Cherry.  It is further recommended that the order adopting this report and recommendation **REMAND** the case to the undersigned for further proceedings prior to setting this case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on April 27, 2006.

**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.