**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JAMES T. CURTIS,**

      **Plaintiff,**

**vs.**                           **Case No. 5:04cv387-RH/WCS**

**DR. PANDIT and ANN WELCH,**

      **Defendants.**

_____/

**<u>FOURTH REPORT AND RECOMMENDATION</u>**[1]

      Several motions filed by Defendant Pandit are pending in this case.  Defendant

Pandit filed a separate special report on March 6, 2006, doc. 74, which was

subsequently construed as a summary judgment motion, doc. 76.  Plaintiff filed his

"declaration in opposition" to Defendant Pandit's summary judgment motion, doc. 79, on

April 14, 2006.  Additionally, after Chief District Judge Hinkle adopted my report and

recommendation entered on April 27, 2006, Defendant Pandit filed a motion to dismiss

the retaliation claims against Defendant Pandit.  Doc. 94.  Plaintiff was given an

_____

[1] A first report and recommendation, doc. 19, concerned Plaintiff's motion for a preliminary injunction.  The second report and recommendation, doc. 84, was on a summary judgment motion filed by Defendants Solomon, Cherry, and Welch.  The third report and recommendation, doc. 107, concerned Plaintiff's second motion for a preliminary injunction.

opportunity to respond, doc. 100, and his response was filed on June 27, 2006.  Doc.

104.  Both of Defendant Pandit's motions will be addressed in this report and

recommendation.

**Motion to Dismiss, doc. 94**

Following entry of Judge Hinkle's order granting in part and denying in part the

summary judgment motion filed by Defendants Welch, et al., doc. 92, Defendant Pandit

filed a motion to dismiss Plaintiff's retaliation claim.  Doc. 94.  That motion noted that in

adopting the report and recommendation, the Court concluded that Plaintiff had failed to

administratively exhaust his claims of retaliation.  *Id.*  In light of that conclusion,

Defendant Pandit argued that Plaintiff failed "to exhaust his administrative remedies as

to any retaliation claim against him."  *Id.*, at 2.

In response to the motion to dismiss, Plaintiff filed a document asserting that he

did exhaust administrative remedies because he submitted an appeal to the Secretary

on October 26, 2005.  Doc. 104.  Within that grievance, Plaintiff wrote that his tooth was

"pulled by Welch and Pandit because they got mad at plaintiff for . . . writing

grievances."  *Id.*

Defendant Pandit's motion was filed on June 9, 2006, just two days after Judge

Hinkle entered the order granting summary judgment in part.  Docs. 92, 94.  However,

after further review of the issue, Judge Hinkle determined on July 20, 2006, that Plaintiff

had "properly exhausted his claim" of retaliation.  Doc. 108.  He concluded that Plaintiff

had set forth his retaliation claim in the appeal to the Secretary, although he had not

presented it at the institutional level first, and the Secretary addressed the claim on "the

merits, without asserting any procedural default or deficiency."  *Id.*, at 3.  Thus, "[w]hen

a prisoner raises a claim at the highest administrative level and the state itself treats the claim as properly asserted at that level and in that manner, the exhaustion requirement is satisfied." *Id.*

Therefore, because it has previously been determined that Plaintiff presented his retaliation claim in the grievance process, naming both Defendants Pandit and Welch in that claim, and the Department addressed his grievance on the merits, it must be concluded that Plaintiff exhausted administrative remedies as to the retaliation claim against Defendant Pandit.  Defendant Pandit's motion to dismiss, doc. 94, should be denied.

**Motion for Summary Judgment, doc. 74**

Plaintiff raises essentially two claims against Defendant Pandit.  He asserts deliberate indifference under the Eighth Amendment and a claim of retaliation under the First Amendment.  Defendant Pandit adopts and incorporates the previously filed summary judgment motion by Defendants Cherry, Solomon, and Welch, doc. 60, and claims that Plaintiff has not demonstrated a serious medical need.  Doc. 74, p. 5. Defendant Pandit asserts that Plaintiff fails to demonstrate he had a serious medical need and, moreover, fails to show he "was subjected to any deliberately indifferent medical care." *Id.*

Defendant Pandit also contends that Plaintiff had access to dental services through dental sick call and dental emergency services.  Doc. 74, p. 6.  Defendant Pandit claims that due to the number of times he was provided treatment, "Plaintiff cannot validly allege that he was not receiving dental treatment." *Id.*, at 7.  Defendant Pandit asserts that Plaintiff's complaint is really "that he was not receiving treatment fast

enough or what he subjectively believed was proper dental treatment." *Id.*  He claims that delay is insufficient to state an Eighth Amendment claim.  *Id.*  Moreover, Defendant claims that the evidence is sufficient to show that Plaintiff was not treated with deliberate indifference.

Plaintiff has filed a declaration in opposition to Defendant Pandit's motion for summary judgment, doc. 79, and a separate statement of material facts.  Doc. 82.  In addition, Plaintiff's previous submission of evidence in opposition to the motion for summary judgment filed by Defendants Solomon, Sherry, and Welch has been considered.  *See* doc. 65.

**Standard of Review**

Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  Thereafter, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.

Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999).

**The relevant Rule 56(e) evidence**[2]

Plaintiff entered the custody of the Department of Corrections on March 23, 2001.  Doc. 60, ex. A3.  On April 2, 2001, Plaintiff was given an initial dental visual examination by Dentist Robert Holland and dental assistant Maria Alonso.  Doc. 60, ex. B.  At that time, Plaintiff was 26 years of age, five feet, eight inches tall, and weighed 176 pounds.  *Id.*  The examination reflects that plaintiff had moderate deposits on his teeth, an inflamed gingival condition, and his "masticating efficiency" was rated "fair."  *Id.*  Under the category of "existing conditions," tooth 13 is noted as missing.  *Id.*  The results of Plaintiff's regional head and neck examination were all "normal."  *Id.*  Under the category of "Assessment," and sub-category of restorations, teeth 01, 02, 04, and 17 are listed.  *Id.*  Plaintiff received an overall dental grade of D2.[3]  *Id.*  An affidavit submitted by Dentist Thomas Shields, II, states that these conditions may "be somewhat uncomfortable," but that "a large segment of the general adult population has a similar diagnosis . . . ."  Doc. 60, ex. C, ¶ 9.[4]  Indeed, such a "condition is not deemed

---

[2] As Defendant Pandit adopted the special report filed by Defendants Solomon, Welch, and Cherry, much of the evidence is taken from document 60.

[3] The criteria for each of the four possible dental grades are listed in Plaintiff's exhibit F.  Doc. 65, attachment, pp. 14-15.  Dental grade I is the best, and grade IV is the worst.  *Id.*

[4] Exhibit C, the affidavit of Dentist Thomas Shields, begins on page 27 of the attachment to document 60 on the Court's electronic docket.

serious, necessitating immediate medical attention."  *Id.*  He said the "restoration was indicated in tooth #1, #2, #4, and # 17."  *Id.*

On April 30, 2001, Plaintiff was transferred to Lake Correctional Institution and his dental records were reviewed with Loretta Saunders, a dental assistant, and Raymond Ladwig, the dentist for Lake C.I.  Doc. 60, ex. B1.  Plaintiff sent an informal grievance on or about June 18, 2001, which was denied, and then went to sick call on June 25, 2001, complaining of a broken tooth.  Doc. 60, ex. B1.  The dentist examined Plaintiff's teeth and, in particular, tooth #4, which was "a non-restorable carious tooth (NRCT) with the root remaining."  Doc. 60, ex. B1, ex. C.  "A tooth in this condition is essentially unable to be repaired and must be extracted."  Doc. 60, ex. C, ¶ 11.  Plaintiff gave his consent and tooth #4 was extracted.  Doc. 60, ex. C, ¶ 11; *see also* ex. B12.  Plaintiff had a post-operative check-up on June 26, 2001, and the dental records reflect that Plaintiff reported no problems with the extraction area.  Doc. 60, ex. C, ¶ 11; ex. B1.

Plaintiff reported to sick call on October 18, 2001, for problems with "painful wisdom teeth."  Doc. 60, ex. B3; ex. C, ¶ 12.  The examination reveal that teeth #1, 16, 17, and 32 were "all present, fully erupted and exhibited pericoronitis, an inflammation of the gingiva or gum surrounding the crown of a tooth, the worst of which was in tooth #16 and #17."  Doc. 60, ex. C, ¶ 12; *see also* ex. B3.  Plaintiff consented to extracting teeth #16 and #17, which was done on October 30, 2001.  Doc. 60, ex. C, ¶ 12; *see also* ex. B13.  The post-operative examination the following day revealed no problems and Plaintiff had no complaints.  Doc. 60, ex. C, ¶ 12; *see also* ex. B3.  Plaintiff was

issued salt for warm saline rinses after meals for the next several days.  Doc. 60, ex. B3.

Plaintiff went to dental sick call on March 21, 2002, complaining that his wisdom tooth was hurting.  Doc. 60, ex. C, ¶ 13; *see also* ex. B3.  Tooth #1 was found to be "a non-restorable carious tooth and malposed."  Doc. 60, ex. C, ¶ 13.  Extraction was recommended, *see* ex. B3, and Plaintiff consented.  Doc. 60, ex. B14; *see also* ex. C, ¶ 13.  Again, at the post-operative check on the following day Plaintiff reported no problems.  Doc. 60, ex. B3; ex. C, ¶ 13.

On August 12, 2002, Plaintiff again went to dental sick call with complaints of bleeding gums and two cavities.  Doc. 60, ex. C, ¶ 14*; see also* ex. B4.  Plaintiff was diagnosed with gingivitis in two teeth from calculus formation and ultrasonic scaling was provided.  Doc. 60, ex. C, ¶ 14.  Another tooth had "caries (decay)" which was partially removed "and Intermediate Restorative Material (IRM) or a temporary filling was placed on the tooth."  *Id.; see also* ex. B4.

Plaintiff again complained of gum problems and soreness on December 17, 2002.  Doc. 60, ex. C, ¶ 15.  Plaintiff was given a periodic dental examination that same day.  *Id.*; *see also* ex. B5.  Deposits on Plaintiff's teeth were found to be "slight, his gingival conditions were normal and masticating efficiency was good."  *Id.*; *see also* ex. B5.  Plaintiff's TMJ was also normal.  Doc. 60, ex. C, ¶ 15.  Plaintiff was given an improved dental grade of "one" at that time by the Dentist, Dr. Newton.  Doc. 60, ex. B5.  It was noted that "tooth #5 was indicated for restoration."  Doc. 60, ex. C, ¶ 15.  Dr. Newton "provided minor debridement and recommended over the counter Ibuprofen, warm salt water rinses and" directed Plaintiff to "continue a good oral hygiene regimen."

*Id.* Doctor Shields explains that salt water rinses have a healing effect on inflamed gingival conditions. *Id.*

Plaintiff was transferred to Union Correctional Institution on January 10, 2003. Doc. 74, ex. A, p. 4. The medical records reflect that Plaintiff did not show up for "dental orientation" on January 24, 2003. Doc. 60, ex. B4. On April 29, 2003, Plaintiff reported to dental sick call with a broken tooth. Doc. 60, ex. B6; ex. C, ¶ 16. The examination found "a distal fracture in tooth #19" and the dentist "excavated the decay and placed an IRM on the tooth." Doc. 60, ex. C, ¶ 16. Plaintiff was advised to submit a request for routine dental treatment. Doc. 60, ex. B6; ex. C, ¶ 16. Plaintiff again completed a dental health questionnaire indicating he was in good health and he had not "had any prior serious trouble with dental treatment." Doc. 60, ex. C, ¶ 16; *see also* ex. B7.

Plaintiff was transferred to Apalachee Correctional Institution, the place where he was incarcerated at the time of the events in question, and arrived at Apalachee C.I.'s West Unit on April 30, 2003. Doc. 74, ex. A, p. 4. It is this period of dental care that is the subject of this complaint.[5]

On July 28, 2003, Plaintiff was given a "dental diagnosis and treatment plan" by Defendant Pandit. Doc. 60, ex. B8; ex. C, ¶ 17. Plaintiff's diagnosis indicates "caries" on teeth #2, #5, #12, #14, #15, #18, #19, #20, #29, #30, and #32. Doc. 60, ex. C, ¶ 17; *see also* ex. B8. Tooth #19 was "noted to have an IRM." Doc. 60, ex. C, ¶ 17. It was also noted that Plaintiff had a history of TMJ trauma as a result of a car accident. Doc.

---

[5] During the two year period following Plaintiff's arrival at Apalachee C.I., he was transferred several times between Apalachee C.I., East Unit, and Pasco County for court related events. Doc. 74, ex. A, pp. 4-5. Plaintiff has not received any disciplinary actions since arriving in the Department of Corrections. *Id.*, at 6.

60, ex. B8.  Defendant Pandit set up a treatment plan for Plaintiff and a cleaning schedule.  Doc. 60, ex. C, ¶ 17.  Plaintiff also appears to have been given a dental examination and a pre-treatment rinse.  *Id.*

Plaintiff went to sick call on October 7, 2003, complaining of pain in the upper left side of his mouth and bleeding gums.  Doc. 60, ex. C, ¶ 1.  Defendant Pandit noted that Plaintiff had "poor oral hygiene" and "treated tooth #15 with an amalgam (or permanent filling)."  Doc. 60, ex. C, ¶ 18; *see also* ex. B9.

On November 24, 2003, Plaintiff received a "standard pre-treatment rinse and a four quadrant (all areas of the mouth) gross debridement or cleaning."  Doc. 60, ex. C, ¶ 19: *see also* ex. B9.  A thorough cleaning must necessarily be done prior to any restorative work.  Doc. 60, ex. C, ¶ 19.

By December 29, 2003, Plaintiff was back at dental sick call complaining of sensitivity with tooth #30.  Doc. 60, ex. C, ¶ 20.  Plaintiff was provided another "standard pre-treatment rinse."  Doc. 60, ex. C, ¶ 20.  Defendant Pandit "determined that tooth #30 should receive an IRM which was placed on the tooth."  *Id.*  Defendant Pandit believed there was "a poor prognosis for the tooth and advised [Plaintiff] that it may have to be extracted if symptomatic."  *Id.*  Plaintiff was given a five pack of acetaminophen and advised by Defendant Pandit to put in a "request for routine care."  Doc. 60, ex. B9; ex. C, ¶ 20.

Plaintiff returned to dental sick call on January 5, 2004, again complaining that tooth #30 hurt only when he ate and said he would rather have the tooth pulled.  Doc. 60, ex. C, ¶ 21; ex. B9.  Defendant Pandit did not pull the tooth at that time, but gave

Plaintiff an antibiotic, Clindamycin, and Ibuprofen and rescheduled Plaintiff for monitoring.  Doc. 60, ex. C, ¶ 21.

On January 12, 2004, Plaintiff returned to dental and authorized Defendant Pandit to extract tooth #30.  Doc. 60, ex. C, ¶ 22; *see also* exhibits B10, B15.  "The extraction process included the surgical shaping of the socket cavity."  Doc. 60, ex. C, ¶ 22.  Plaintiff returned to the dental department later that day "on an emergency basis complaining of bleeding from the socket site."  *Id.*  After giving Plaintiff a pre-treatment rinse, Defendant Pandit "noted minor oozing from the site, reassured [Plaintiff] and provided a gauze pressure pack."  Doc. 60, ex. C, ¶ 22*; see also* ex. B10.  Plaintiff returned to dental the next day for a follow-up and "the extraction site was noted to be healing within normal limits with no bleeding."  Doc. 60, ex. C, ¶ 22*; see also* ex. B10.

On January 13, 2004, Plaintiff was transferred to the Land O' Lakes Detention Facility in Pasco, County, Florida.  Doc. 65, p. 12.[6]  Medical staff at the jail treated Plaintiff on January 16, 2004, for the dry socket and infection.  *Id.*  He was given medications, but because the pain and infection got worse, Plaintiff went back to the medical sick call at the jail.  *Id.*  The dentist for the jail examined Plaintiff on or about January 21st, and confirmed that the dry socket was infected.[7]  *Id.*  This dentist also told Plaintiff that part of his pain was from tooth #32 which was "rotted [sic] below the gum line" and the dentist pulled the tooth.  Doc. 65, pp. 12-13.  Plaintiff asserts that Defendants Pandit and Welch both knew that tooth #32 was hurting when they pulled

---

[6] Plaintiff's evidence in opposition to the previous summary judgment motion has been considered.  Doc. 65.

[7] Plaintiff asserts that due to his indigency, he cannot "afford to obtain the dental records from the county jail in Pasco County."  Doc. 65, p. 13.

tooth #30, but they would not bother with this tooth at that time.  *Id.*  He avers that both teeth could have been fixed on the same day.  *Id.*, at 13.[8]

On March 24, 2004, Plaintiff returned to the dental department; he was provided the "standard peridex rinse" and his health questionnaire was reviewed.  Doc. 60, ex. C, ¶ 23.  Plaintiff had a "four quadrant scaling and polishing and was provided oral health instructions."  *Id.; see also* ex. B10.  Dr. Kamath noted that Plaintiff was set for an appointment for amalgams on teeth #2 and #5.  Doc. 60, ex. C, ¶ 23.

On November 5, 2004, Plaintiff complained that tooth #19 was bothering him at times and was examined by Dentist Bruce Tanner.  Doc. 60, ex. C, ¶ 24; *see also* ex. B11.  "The IRM and recurrent caries were removed which were noted to be very deep but with no pulp exposure."  Doc. 60, ex. C, ¶ 24.  Plaintiff was given a permanent filling, and "advised of the guarded prognosis for saving the tooth due to it already having been symptomatic and the very deep decay present."  *Id.*  Dr. Tanner also noted that Plaintiff would have an appointment for amalgams on teeth #12 and #14.[9]  *Id.*  On June 9, 2005, Plaintiff was transferred to Hardee Correctional Institution.  Doc. 60, ex. A4, ex. B11.

---

[8] Plaintiff was transferred from Pasco County back to Apalachee C.I.'s East Unit on February 3, 2004.  Doc. 74, Ex. A.  On May 11, 2004, he was returned to Pasco County, and then brought back to the East Unit of Apalachee C.I. on July 2, 2004.  *Id.*  Plaintiff went back to Pasco County on August 20, 2004, and returned to the East Unit on September 14, 2004.  Plaintiff then was transferred to the West unit of Apalachee C.I. on December 16, 2004.  *Id.*

[9] Notably, these teeth are not the ones which were set for amalgams at the March 24th appointment.  There is no record presented in this evidence showing that teeth #2 and #5 were treated.  Nevertheless, the evidence shows Plaintiff was sent from Apalachee Correctional Institution to Pasco County on May 11, 2004, until July 2, 2004.  Doc. 60, ex. A3.  After being returned to Apalachee C.I. for just over a month, Plaintiff returned to Pasco County from August 20, 2004, until September 14, 2004.  Doc. 60, ex. A3-A4.

In the period of time between March, 2001, and June, 2005, Plaintiff went to dental sick call for dental treatment nine times, three of which were during his incarceration at Apalachee Correctional Institution.  Doc. 60, ex. C, ¶ 28.  Plaintiff also had another "emergency" appointment on January 12, 2004, after a tooth extraction.  *Id.* In all, it appears that Plaintiff received dental treatment in one form or another on approximately twenty occasions in this four year period.[10]  This included a cleaning on November 24, 2003, and another cleaning on March 24, 2004.  Doc. 60, exhibits B-9 and B-10.  Dr. Shields summarized:  "Of the eleven teeth identified by Dr. Pandit as indicated for restoration, [Plaintiff] received treatment on three at Apalachee Correctional Institution including, a permanent filling on tooth #15 on October 7, 2003, removal of an IRM and existing decay and placement of a permanent filling on #19 on November 5, 2004 and a patient authorized extraction of tooth #30 on January 12, 2004."  Doc. 60, ex. C, ¶ 27.

As additional evidence, Defendant Pandit submitted his own affidavit in which he states that he rendered dental treatment to Plaintiff "on several occasions between July, 2003 and February, 2004."  Doc. 74, Ex. C.  In particular, Defendant Pandit recounted making an assessment of Plaintiff's dental needs on July 28, 2003, and providing treatment ("an amalgam or permanent filling" on tooth #15) when Plaintiff reported to dental sick call on October 7, 2003.  *Id.*, at 2.  On November 24, 2003, Defendant

---

[10] Treatment in some form by dental providers occurred on: June 25, 2001; June 26, 2001; October 18, 2001; October 30, 2001; October 31, 2001; March 21, 2002; March 22, 2002; August 12, 2002; December 17, 2002; April 29, 2003; July 28, 2003; October 7, 2003; November 24, 2003; December 29, 2003; January 5, 2004; January 12, 2004, morning and afternoon; January 13, 2004; March 24, 2004; and November 5, 2004.

Pandit acknowledges performing a "pre-treatment rinse and a four quadrant (all areas of the mouth) gross debridement or cleaning."  *Id.*

On December 29, 2003, Defendant Pandit provided a pain relieving medication and an IRM or temporary filling for tooth #30.  *Id.*  Defendant Pandit avers that Plaintiff returned to dental sick call on January 5, 2004, complaining of pain in tooth #30, and stating that he wanted the tooth pulled.  *Id.*  Defendant Pandit avers:

> At this point, I did not believe an extraction may have been in [Plaintiff's] best interests and undertook an alternative to extraction by attempting to relieve tooth #30 from occlusion.  Occlusion is the force of contact between the surfaces of opposing teeth.  Relief of a tooth from occlusion is accomplished by the careful and minimal removal of those parts of the tooth that are subject to this force of contact.  This reduces the pressure on the tooth and helps calm the tooth down to where an extraction may not be needed.  I provided [Plaintiff[] the antibiotic Clindamycin and Ibuprofen for pain relief and he was rescheduled for further monitoring of the tooth.

Doc. 74, ex. C, p. 2.

Approximately one week later, on January 12, 2004, Defendant Pandit re-examined Plaintiff and states that at that time, Plaintiff authorized Defendant Pandit "to extract tooth #30."  *Id.*, at 3.  The extraction "of this tooth included the surgical shaping (alveoplasty) of the socket cavity."  *Id.*  Plaintiff was examined "later that day on an emergency basis when he complained of bleeding from the socket site."  *Id.*  Defendant Pandit documented some minor oozing from the site, reassured Plaintiff, and gave him a "gauze pressure pack to stem any residual bleeding."  *Id.*  Defendant Pandit examined Plaintiff again the following day, January 13th, and found the socket site "to be healing within normal limits with no bleeding."  *Id.*

On January 13, 2004, Plaintiff was transferred to the Land O Lakes jail in Pasco, County, Florida. Doc. 65, p. 12. Medical staff at the jail treated Plaintiff on January 16, 2004, for the dry socket and infection. *Id.* He was given medications, but because the pain and infection got worse, Plaintiff went back to the medical sick call at the jail. *Id.* The dentist for the jail examined Plaintiff on or about January 21st, and confirmed that the dry socket was infected.[11] *Id.* This dentist also told Plaintiff that part of his pain was from tooth #32 which was "rotted [sic] below the gum line" and pulled the tooth. Doc. 65, pp. 12-13. Plaintiff asserts that Defendants Pandit and Welch both knew that tooth #32 was hurting when they pulled tooth #30, but they would not bother with this tooth at that time. *Id.* Plaintiff avers that both teeth could have been fixed on the same day. *Id.*, at 13.

Defendant Pandit contradicts Plaintiff's allegation that he refused to save a tooth and extracted it instead. Doc. 74, ex. C, p. 3. He states that he extracted tooth #30 with Plaintiff's authorization and that he did so because, in his "medical opinion an extraction at that point was in the best interests of the patient . . . ." *Id.* Defendant Pandit reiterates that the delay in extraction between January 5th and January 12, 2004, was an attempt for "curative measures" on tooth #30 even though there was a "poor prognosis for this tooth." *Id.*

Defendant Pandit also states that Plaintiff's allegation that he deliberately broke a tooth during an extraction to punish Plaintiff "for coming to sick call and filing grievances" is "absolutely false." Doc. 74, ex. C, p. 3. Defendant Pandit avers that he

---

[11] Plaintiff asserted that he could not "afford to obtain the dental records from the county jail in Pasco County." Doc. 65, p. 13.

"never retaliated against Plaintiff in any manner for accessing dental services or filing grievances." *Id.* Further, he states that he "would never deliberately break a tooth during an extraction unless it was a medical necessity and [he] did not deliberately break [Plaintiff's] tooth in order to punish him or cause him pain." *Id.* Defendant Pandit acknowledges that it is more desirable to "extract a tooth in whole condition" although it is "not uncommon for a tooth to break off during an extraction especially when the condition of a tooth is poor as was" this tooth. *Id.*

Defendant Pandit also disputes Plaintiff's claim that he refused to treat Plaintiff's infected tooth and torn gums. Doc. 74, ex. C, p. 4. Defendant Pandit avers that Plaintiff never "presented at dental services with this complaint while [Defendant Pandit] was at Apalachee Correctional Institution." *Id.* Furthermore, Defendant Pandit disputes Plaintiff's claim that he had a temporary filling fall out, but received no treatment. *Id.* Defendant Pandit states that Plaintiff never "presented at dental services with [that] complaint . . . ." *Id.* Defendant Pandit states that the dental treatment records noted an "IRM on tooth #19 and" Plaintiff was provided "a permanent filling on that tooth." *Id.* "The dental treatment record does not reflect this temporary filling ever fell out." *Id.* Additionally, Defendant Pandit disputes Plaintiff's claim that Plaintiff was refused a special diet pass due to dental problems. "If [Plaintiff] had presented at dental services requesting a soft food pass, [Defendant Pandit] would have assessed his need for such pass." *Id.*

Defendant Pandit reiterates that he makes the determination as to what dental care is appropriate and should be provided. Doc. 74, ex. C, p. 4. Defendant Pandit does not "take orders" from dental assistants such as Defendant Welch. *Id.* Finally,

Defendant Pandit states that he has "never retaliated against [Plaintiff] for filing grievances of accessing sick call" and "never maliciously intended to deliberately injure or cause pain to [Plaintiff] while rendering dental services." *Id.* Plaintiff's treatment was provided "based on [Defendant Pandit's] medical training and knowledge" and provided with what Defendant Pandit believed was in Plaintiff's best interests. *Id.*, at 5.

Plaintiff submitted a declaration under penalty of perjury. Doc. 79. Plaintiff states that Defendant Pandit gave him a dental examination and was aware of Plaintiff's "very poor dental health." *Id.* Plaintiff states that Defendant Pandit knew Plaintiff had eleven cavities, bleeding gums, and T.M.J, and knew Plaintiff was in pain, and that if the conditions were left untreated, Plaintiff's teeth would have to be pulled. *Id.*, at 22. Plaintiff states that Defendant Pandit "chose not to provide treatment." In particular, Plaintiff avers that Defendant Pandit told him that if Plaintiff did not let him pull his tooth, Plaintiff "would get a disciplinary report which would result in confinement, disciplinary squad, and loss of gain time." *Id.* and at 10-11. He asserts that Defendant would not give him enough medication to stop any pain when he pulled the tooth, and "personally told Plaintiff he broke Plaintiff's teeth and torn [sic] Plaintiff's gums for writing all the grievances." *Id.*, at 11.

Plaintiff states that Defendant Pandit "did refuse to give [Plaintiff] a soft diet pass when [he] had a dry socket that was infected and food was getting lodged in the open wound." *Id.*, at 22. Furthermore, Plaintiff states that Defendant Pandit "refused treatment for the infection and only by" being transferred to a county jail was Plaintiff able to get treatment for the infection and pain. *Id.* Plaintiff avers also that Defendant Pandit told him he broke Plaintiff's tooth to punish him for "writing grievances and for [ ]

coming to dental sickcall after being instructed not to." *Id.* Plaintiff claims that even now, he has not "recieved [sic] dental care for all cavities and most if not all will have to be pulled." *Id.*, at 23.

In Plaintiff's previous submission of his opposition to summary judgment, Plaintiff also stated that when he was called back to dental to get his tooth pulled on January 12th, "Defendant Pandit refused to give the plaintiff enough medication to numb [his mouth] and when Plaintiff told Defendant Pandit [sic] Defendant Welch told Plaintiff to shut up and said your [sic] lucky your [sic] getting anything." Doc. 65, p. 11. Plaintiff further testified that "Defendant Pandit took a dental tool and broke plaintiff's tooth into pieces and then had to dig them out." *Id.* Plaintiff reports that Defendant Pandit did not even try to pull the tooth. *Id.* Defendants Pandit and Welch again told Plaintiff to he would "learn to stop writing grievances." *Id.*

**Analysis**

Plaintiff raises both Eighth Amendment and First Amendment claims against Defendant Pandit. Plaintiff claims Defendant Pandit refused to give Plaintiff dental treatment to relieve Plaintiff's pain, suffering and discomfort. Doc. 25. Plaintiff contends that Defendant Pandit knew Plaintiff was in pain, yet refused to provide treatment. *Id.* Further, Plaintiff alleges that he was refused a soft diet pass or slow eating pass and told he just needed "to learn to tough it out." *Id.* Plaintiff also claims that Defendant Pandit refused to save one of his teeth, but pulled it instead as a punishment. *Id.* Plaintiff claims that after the extraction, his tooth and gums developed an infection and Defendant Pandit refused to provide treatment. *Id.* Furthermore, Defendant Pandit allegedly was aware that a filling had fallen out yet he refused to treat Plaintiff. *Id.*

Furthermore, as noted above, Plaintiff also claims that Defendant Pandit violated his

First Amendment rights by retaliating against Plaintiff.  *Id.*

### a.    Eighth Amendment claims

"Although the United States Constitution does not require comfortable prisons,

neither does it permit inhumane ones."  Farrow v. West, 320 F.3d 1235, 1242 (11th Cir.

2003), *citing* Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d

811 (1994).  The treatment a prisoner receives in prison, along with the conditions

under which the prisoner is confined, is governed by the Eighth Amendment, which

prohibits cruel and unusual punishment.  Farrow, 320 F.3d at 1242, *citing* Helling v.

McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993).  Prison

conditions rise to the level of an Eighth-Amendment violation only when they involve the

wanton and unnecessary infliction of pain.  Hope v. Pelzer, 536 U.S. 730, 737, 122

S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002); Farrow, 320 F.3d at 1242.  To establish the

wanton and unnecessary infliction of pain, a prisoner must show "that officials acted

with specific intent."  Campbell v. Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999).

In an Eighth Amendment case such as this one where the alleged violation is

based on a medical condition, the prisoner must demonstrate that a Defendant was

deliberately indifferent to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 97

S. Ct. 285, 50 L. Ed. 2d 251 (1976).  Deliberate indifference is more than negligence,

but is satisfied by something less than actions undertaken with an intent to cause harm.

Farmer v. Brennan, 511 U.S. 1216, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).

Combining the standards from Farmer and Estelle, the Eleventh Circuit has clarified

that, "[u]ltimately, there are thus four requirements: an objectively serious need, an

objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001).  The Eleventh Circuit has recognized that "[g]rossly incompetent or inadequate care can constitute deliberate indifference . . . as can a doctor's decision to take an easier and less efficacious course of treatment." Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989), *citing* Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986); McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

Medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), *citing* Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). Furthermore, Eighth Amendment claims are judged in light of "the evolving standards of decency that mark the progress of a maturing society," Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992), and consider whether a prisoner has been subjected to the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 103-104, 97 S. Ct. at 290-291.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson, 503 U.S. at 9, 112 S. Ct. at 1000, *citing* Estelle, 429 U.S. at 103-104, 97 S. Ct. at 290-291; Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994).

Defendant Pandit is entitled to summary judgment in his favor with regard to Plaintiff's claim that he refused to treat an infection and dry socket that developed after Plaintiff's tooth #30 was pulled on January 12, 2004. The evidence reveals that Plaintiff was examined later that day after he complained of a problem following the extraction. At that point, medical personnel did not find any signs of an infection, just "minor oozing" and bleeding from the socket. Plaintiff was examined, given a gauze pressure pack, and after some reassurance, Plaintiff was released. Plaintiff was examined the following day and the medical evidence shows his condition was normal and the extraction site "healing within normal limits with no bleeding." Plaintiff left the institution the day after the extraction and was in Pasco County when the infection would have developed. An infection would not have developed on the day of the extraction, but some time afterwards. Thus, Defendant Pandit cannot be held responsible for failing to treat an infection that would have occurred outside his presence. Summary judgment should be granted in favor of Defendant Pandit on this claim.

Plaintiff did not file a grievance with respect to alleged denial of eating passes. Because administrative remedies are unexhausted as required by 42 U.S.C. § 1997e(a), this claim cannot be litigated in this case. Defendant Pandit is entitled to summary judgment on this claim as well.[12]

Plaintiff also claims that Defendant Pandit was aware that a filling had fallen out in tooth #19, yet he refused to treat Plaintiff. The prior report and recommendation, doc. 84, determined that there was no evidence in any of the medical records that Plaintiff

---

[12] Summary judgment was previously granted in favor of all other Defendants on this particular claim for the same reason. Doc. 84, p. 33; doc. 92.

complained of pain in tooth #19 or that he lost a filling.  *Id.*  The only evidence was that in November, 2004, a day before Plaintiff received a permanent filling on that tooth by Dentist Tanner, Plaintiff complained of pain.  Thus, because there is no evidence that the temporary filling had fallen out, or that Defendant Pandit refused to provide treatment for this tooth, summary judgment should be granted in Defendant Pandit's favor on this particular claim.

With regard to teeth # 30 and 32, Plaintiff submitted evidence that Defendant Pandit knew Plaintiff was in pain, but would provide only partial dental treatment. Plaintiff's evidence is that two teeth (#30 and #32) were causing problems, but Defendant Pandit would only provide treatment for one tooth, tooth #30.  He asserts that Defendant Pandit forced him to have this tooth pulled with a threat of a disciplinary action if he refused.  Further, Plaintiff presented evidence that when Defendant Pandit did provide treatment, Defendant Pandit kept Plaintiff in pain for a week before finally performing the extraction.  The extraction was also, according to Plaintiff, unnecessarily painful because Defendant Pandit broke the tooth into pieces and dug the pieces out, without ever trying to simply pull the tooth.  Plaintiff also claims that Defendant Pandit said he pulled the tooth and broke it as a "punishment" and not because it was medically necessary.  *Id.*  Viewing Plaintiff's evidence in the light most favorable to him, and the court must do, Plaintiff has presented evidence such that a jury could find that Defendant Pandit deliberately caused pain to Plaintiff with respect to the treatment of teeth # 30 and 32..

Defendant argues that Plaintiff's cavities are not necessarily a serious medical need.  However, Plaintiff has presented evidence that he was in pain and was not given

treatment for his pain.  Thus, regardless of how "serious" a cavity might be, the issue is

treatment for pain.  There is at least a jury question on whether Plaintiff experienced

intense or severe pain and was purposefully left in that condition, and there is a jury

question as to how the extraction of tooth # 30 was handled.  The Eleventh Circuit has

recognized that "the need for dental care combined with the effects of not receiving it

may give rise to a sufficiently serious medical need to show objectively a substantial risk

of serious harm."  Farrow v. West, 320 F.3d 1235, 1243-1244 (11th Cir. 2003) (other

citations omitted).  At this point, there is a genuine dispute of fact as to whether

Plaintiff's dental need was such that, "if left unattended, 'pos[es] a substantial risk of

serious harm.' "  Farrow v. West, 320 F.3d at 1243, quoting Taylor v. Adams, 221 F.3d

1254, 1258 (11th Cir. 2000).  These are triable issues of material fact and summary

judgment should be denied as to the Eighth Amendment claim against Defendant

Pandit as to the treatment of teeth # 30 and 32.

**b.      Retaliation claim**

"It is well established that a prisoner's constitutional rights are violated if adverse

action is taken against him in retaliation for the exercise of his First Amendment rights."

Pate v. Peel, 256 F.Supp.2d 1326, 1336 (N.D. Fla. 2003), citing Farrow v. West, 320

F.3d 1235, 1248 (11th Cir. 2003); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th

Cir.1997); Wright v. Newsome, 795 F.2d 964 968 (11th Cir. 1986); Adams v. James,

784 F.2d 1077, 1080 (11th Cir. 1986).  Prison officials may not infringe on an inmate's

First Amendment right to petition the government for a redress of his grievances with a

practice that is "not reasonably related to legitimate penological objectives" or take

certain actions "with the intent of chilling that First Amendment right."  Harris v. Ostrout,

65 F.3d 912, 916 (11th Cir. 1995), *citing* Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989); *see also* Pate, 256 F.Supp.2d at 1336.  Retaliation in the prison setting may be established by demonstrating that a prison official took adverse actions against an inmate because he filed a grievance.  *See* Farrow, 320 F.3d at 1248; Pate, 256 F.Supp.2d at 1336.

A prisoner may not rely on a general attack upon a defendant's motivation, but must produce "affirmative evidence" of retaliation.  Crawford-El v. Britton, 523 U.S. 574, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998).  This requirement for such evidence exists because of "the ease with which claims of retaliation may be fabricated" by inmates and the "near inevitability" that prisoners will take exception with the decisions of prison officials.  Pate, 256 F.Supp.2d at 1336-37, *citing* Dawes v. Walker, 239 F.3d 489, 491 (2nd Cir.2001), impliedly overruled in part on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).  Nevertheless, a prisoner will not be held to a heightened burden of proof.  Crawford-El, 523 U.S. at 580-86, 118 S.Ct. 1584 (holding that in retaliation claim prisoner could not be required to show "clear and convincing" evidence of defendant's unconstitutional motives).

The *Mount Healthy* and *Pickering* decisions guide analysis of a First Amendment retaliation claim even in the prison context.  Pate, 256 F.Supp.2d at 1339; *relying on* Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also* Osterback v. Kemp, 300 F.Supp.2d 1238, 1251 (N.D. Fla.

2003). Although the framework was established in the employment context, it is

beneficial to maintain uniformity in these types of cases. The employment four-step

analysis is reduced to a three-step analytical framework, but continues to provide a

workable standard to guide all retaliation cases. This framework, derived in large part

from the Sixth Circuit's opinion in Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999),

will be applied in evaluating Plaintiff's retaliation claim against Defendant Pandit.[13]

Osterback, 300 F.Supp.2d at 1252; Pate, 256 F.Supp.2d at 1337-38. Thus, Plaintiff

must demonstrate (1) that he engaged in protected First Amendment activity, (2)

suffered an adverse action because of that activity, and (3) show a causal connection

between the two. If Plaintiff comes forward with such evidence, the burden shifts to the

Defendant to prove that he would have taken the same actions anyway for legitimate

reasons. Since this is Defendants' motion for summary judgment, however, and Plaintiff

has the ultimate burden of proof, Defendant need only point to evidence as to the

---

[13] Two other circuits have applied the *Pickering* and *Mount Healthy* test to First Amendment claims of retaliation in the prison setting. Rauser v. Horn, 241 F.3d 330, 333-334 (3d Cir. 2001); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998); Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996). The Sixth Circuit still follows Thaddeus-X. Bell v. Johnson, 308 F.3d 594, 609 (6th Cir. 2002). Two other circuits have not adopted a burden-shifting framework, but use a more stringent "but for" analysis. *See* Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998) (requiring prisoner to "prove that 'but for' the retaliatory motive, the incidents" which he claims were retaliatory "would not have taken place."); Goff v. Burton, 7 F.3d 734, 737 (8th Cir. 1993), *cert. denied* 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994) (declining to use Mount Healthy analysis in retaliatory transfer case and applying the more stringent "but for" test; "prisoner must prove that retaliation was the actual motivating factor for the transfer."). The Eleventh Circuit, however, has rejected this "but for" standard for Plaintiff's proof, as noted above, so these decision are not persuasive. Osterback v. Kemp, 300 F.Supp.2d 1253-54. Indeed, in Osterback, it was noted that in an unpublished opinion, the Eleventh Circuit used this simplified analytical framework in considering a prisoner's claim of retaliation. *Id.; see also* Texas v. Lesage, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (utilizing the Mount Healthy framework in considering a § 1983 equal protection claim).

legitimate reason and Plaintiff must show that there is a genuine dispute of material fact

concerning Defendant's defense.  *See* Osterback, 300 F.Supp.2d at 1254.

Plaintiff has come forward with evidence showing the first element of his

retaliation claim, that he engaged in protected First Amendment activity.  It is

undisputed that Plaintiff filed administrative grievances concerning his dental care.

As for the second and third elements, Plaintiff has alleged that both Defendants

Pandit and Welch directed Plaintiff to choose whether he would get a disciplinary report

or have a tooth pulled, implicitly suggesting that the tooth did not need to be pulled.

Plaintiff has also presented evidence showing that Defendant Pandit said that he pulled

Plaintiff's tooth and broke the tooth into pieces in the process as a means punishing

Plaintiff for writing grievances and not because the tooth needed to be extracted.

In light of the evidence presented by Plaintiff, there is a genuine dispute of

material fact on this issue.  Plaintiff has come forward with sufficient evidence showing

that he was subjected to adverse consequences because of his grievances.  Defendant

Pandit's summary judgment motion should be denied as to the retaliation claim.

### c.    Qualified Immunity

Defendant Pandit raises qualified immunity as a defense in this case.  Doc. 74, p.

13.  This defense provides that a defendant is not liable for money damages if his or her

conduct did not violate a clearly established right.  *See* Hope v. Pelzer, 536 U.S. 730,

122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002); Saucier v. Katz, 533 U.S. 194, 201, 121

S.Ct. 2151, 150 L.Ed.2d 272 (2001).  "For a constitutional right to be clearly established,

its contours must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right."  Hope v. Pelzer, 536 U.S. at 739, 122 S.Ct. at 2515,

*cited in* <u>Magluta v. Samples</u>, 375 F.3d 1269, 1283 (11th Cir. 2004). "The very action in question does not have to have been found unlawful, but in light of pre-existing law the unlawfulness must be apparent." <u>Magluta v. Samples</u>, 375 F.3d at 1283, *citing* <u>Hope v. Pelzer</u>, *supra.*

<u>Farrow v. West</u>, *supra*, was decided by the Eleventh Circuit on February 7, 2003, and Plaintiff's allegations arise after that date. That case specially concerned delay in treatment by a dentist, nurse, and dentist's supervisor. The Eleventh Circuit refused to address defendants' claim of qualified immunity because it was not properly raised on appeal. Nevertheless, the case is helpful for providing notice that dental claims are not insulated from Eighth Amendment claims and officials who fail to provide dental care may be held liable. Moreover, a reasonable dental practitioner in a prison setting would certainly know that being deliberately indifferent to a claim of pain and refusing to provide treatment violates the Eighth Amendment.

To the degree Defendant Pandit contends he lacked subjective knowledge of any risk of serious harm to Plaintiff, the defense is not well taken. If Plaintiff's evidence is to be believed by a jury, and it must be deemed true at this stage of this case, failing to treat claims of pain, and leaving a patient in a painful condition for a week prior to pulling a tooth, and then extracting the tooth in an intentionally painful manner would amount to deliberate indifference to Plaintiff's serious medical needs relating to pain.

Furthermore, it has been well established for many years that an inmate may not be retaliated against for writing grievances. In this case, qualified immunity is precluded based on the disputed facts which, if true as presented by Plaintiff, are unconstitutional acts of which a reasonable prison official would know.

**CONCLUSION**

In light of the foregoing, it is respectfully recommended that Defendant Pandit's motion to dismiss, doc. 94, be **DENIED**, and that Defendant Pandit's motion for summary judgment, doc. 74, be **GRANTED in part and DENIED in part**.  Summary judgment should be **DENIED** as to the First Amendment retaliation claim and the Eighth Amendment claims against Defendant Pandit as identified above, both relating to the treatment of teeth #30 and 32.  Summary judgment should be **GRANTED** as to the Eighth Amendment claim against Defendant Pandit for refusing to treat an infection, for the alleged denial of eating passes, and for refusing to treat Plaintiff's complaints of pain in tooth #19 when Plaintiff lost a filling.   It is further recommended that the order adopting this report and recommendation **REMAND** the case to me for further proceedings prior to setting this case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on December 20, 2006.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**